**35 So.2d 210**

Succession of **YEATES.**

No. 38264.

March 22, 1948.

Rehearing Denied April 26, 1948.

Campbell & Campbell, of Minden, for plaintiff-appellants.

A. S. Drew, of Minden, for appellee.

FOURNET, Justice.

The five sisters of E. Clifton Yeates— Mrs. Effie McClellan, Mrs. Ella Rowe, Mrs. Beatrice Martin, Mrs. Nellie Barry, and Mrs. Emma Todhunter—are appealing from a judgment rejecting their demand that a deed executed by their late mother, Mrs. S. A. (Alice) Yeates, on June 25, 1941, conveying to him certain improved property in Cotton Valley, Louisiana, be set aside, while the last two named sisters are also appealing from a judgment ordering the probate, over their opposition, of their late mother's will, dated January 31, 1942. The two proceedings having been consolidated for the purpose of trial in the lower court, they were submitted on the same evidence.

In the first suit, filed on April 12, 1944, some five months after the death of Mrs. Yeates, the sisters, alleging that their mother had died intestate and that they desired to accept her succession with benefit of inventory, sought to bring into the mass of her estate the property covered by the above mentioned deed by attacking it on the ground (1) that at the time of its execution their mother was of an unsound mind, (2) that the recited cash consideration of $750 was never in fact paid, and (3), in the alternative, that the deed was a donation in disguise in the form of a sale, and, as such, null and void under the provisions of Article 1533 of the Revised Civil Code since Mrs. Yeates reserved the usufruct thereof to herself during her life.

Subsequently, on May 4, 1944, two days after the will in controversy here was presented for probate, two of the sisters, **Mrs.**

Nellie Barry and Mrs. Emma Todhunter, opposed the same on the ground (1) that it was not drawn in legal form, (2) that at the time of its confection the testratrix was physically and mentally incompetent, and (3) that the will was executed under duress and undue influence on the part of their brother, E. Clifton Yeates.

Since the principal ground upon which both of these actions are based is that the decedent was mentally incompetent to execute either of these instruments, it is necessary that a brief history of the decedent's early life and a complete account of the pertinent events surrounding and leading up to the execution of these instruments be given.

According to the record, Mrs. Alice Yeates, upon the death of her husband in 1922, was faced with the problem of supporting and raising her seven living children. (One of the sons, William C. Yeates, does not appear in either of these proceedings.) She met this problem with the forthright honesty and energy that were to characterize the remainder of her life. She first operated a boarding house, and, later, a hotel. She was also a merchant and the operator of a saloon. As the result of her efforts and thrift, she was able to accumulate a fair amount of property, consisting of both cash and real estate. In her declining years her energies were directed toward the renting and upkeep of her various properties. However, although Mrs. Yeates went through the usual

deterioration expected in a woman of her years, she remained vigorous and energetic until on February 19, 1941, while collecting rents, she became stricken with what was at first thought to be a "stroke" but was later diagnosed to be a "cerebral accident," as it was termed by one of the physicians who treated her. On February 23, 1941, she was taken to the Highland Sanitarium in Shreveport for treatment and she remained there for 15 days. After she returned to her home she was under the care of her local physician.

On April 23, 1941, at a time when she was completely bedridden and attended constantly by a practical nurse, Mrs. Yeates purportedly appeared before a notary public in his office and conveyed to her son, E. Clifton Yeates, for the recited consideration of $1,000 in cash "and as a further consideration his the said E. C. Yeates' service in superintending my business for several years valued at an additional sum of One Thousand ($1,000.00) Dollars," a lot fronting on the Louisiana & Arkansas railroad in Cotton Valley, together with the improvements thereon. Around the middle of May, Mrs. Yeates again became extremely ill and was taken to the Highland Sanitarium for further treatment. It was then found that she was suffering from a slight hempilogia (paralysis) involving the right side of her body and proving to be somewhat of an impediment to her speech; arthritis of the cervical (neck) vertebrae, which apparently caused extreme pain in

her left arm and shoulder; and a psychotic (mental) condition that was found to be the result of intoxication brought about by the bromides she had taken for the aleviation of pain rather than from a mental disorder due to senile changes, for she improved as the bromide level was corrected. At that time Mrs. Yeates was 74 years old.

While Mrs. Yeates was in the Highland Sanitarium on this occasion, Mrs. McClellan, one of the daughters, becoming suspicious of her brother, whom she says she found in her mother's home shortly before her removal to the sanitarium securing the mother's signature on blank checks under the pretext that he was testing her eyesight to see if it was good enough for her to write on a straight line, began an investigation of her mother's affairs. She found that on April 28, 1941 (five days after Mrs. Yeates purportedly sold the property in Cotton Valley to her son), by means of a check signed by her mother and made out to cash, her brother secured $310 from the bank, although he did not endorse the check. On April 30 he secured $275 in a like manner; on May 2 the sum of $215, and on May 8 the sum of $200, or a total of $1,000. In order to place the bank on its guard against similar checks and to protect their interests in the event their mother, then gravely ill in Highland Sanitarium, died, Mrs. McClellan testified she and another sister, Mrs. Ella Rowe, instituted interdiction proceedings against their mother, alleging her inability to care for her person and to administer her affairs. Although these papers were never served on Mrs. Yeates because of the effect it was thought they would have on her condition, the sisters did confront their brother with their suspicions with respect to the purported purchase by him of the Cotton Valley property and what they thought to be a refund of the $1,000 consideration allegedly paid for such conveyance as indicated by the four checks cashed by him at the bank, and Yeates, on June 14, shortly after his mother's return from the sanitarium, reconveyed this property to her for a recited consideration of $1,000. Ten days later, on June 25, 1941, Mrs. Yeates again transferred this property to her son, although this time the purported consideration was $750 and she reserved the usufruct of the property for the remainder of her life.

Having been told by her son of the interdiction proceedings, Mrs. Yeates, following her return from the Highland Sanitarium early in June, became more or less estranged from the rest of her children and seemed to be obsessed with the idea that they were endeavoring to have her committed to an insane asylum. At this time she was also apparently concerned about her will. She took a document she had prepared to her attorney wherein she left everything she owned to her son Clifton, but when she was advised that such a will was illegal, she had the attorney prepare a draft of the will she wanted and she copied it in his office. (Some time prior there-

to this same attorney had advised her that a will in which she sought to exclude her other son, William C. Yeates, was illegal.) Returning to his office some time later, she told the attorney she had destroyed the will copied by her and she again sought his services in drafting a new will. After the attorney had drafted the new will in accordance with her stipulations, she took the rough draft home with her and copied it, returning some time later with it and seeking his approval. This is the will dated January 31, 1942, that is entirely written, dated, and signed by the deceased in her own handwriting and wherein she not only bequeathed to her son Clifton the disposable portion of her estate as an extra portion, but also stipulated she had theretofore "sold to E. Clifton Yeates the naked ownership of certain property in Cotton Valley La consideration of $750.00 and this money has been received by me and used to maintain me in my old age and it is my wish that this sale be fully maintained and I hereby ratify and reaffirm same at this time." After the attorney read the will over and approved its validity, it was placed in an envelope in his presence and Mrs. Yeates wrote across the face in her own handwriting the words "last Will and testament of Mrs. S. A. Yeates."

During the remaining period of her life, although she suffered recurrent spells of illness, Mrs. Yeates apparently went about her duties and her work pretty much as she had always done. She drove her own car, attended to her properties and the collection of her rents, did her own work, and enjoyed her favorite pastime, fishing. When she suffered her fatal illness in the latter part of 1943, she was taken to the home of Mrs. McClellan and from there to the Highland Sanitarium, where she died on November 4, 1943. These suits followed.

Since the cases were tried in the lower court and while they were pending on appeal here, E. Clifton Yeates died and his widow and son were made parties to the proceedings.

■ The evidence clearly shows that the will was entirely written, signed, and dated by the testatrix and as such it is valid and legal, an olographic will being subject to no other form. Article 1588 of the Revised Civil Code. And we must conclude, as did the trial judge, that the evidence fails to establish that the decedent was mentally incompetent at the time of the execution of the documents in controversy. In fact, we think the overwhelming preponderance of the evidence establishes the contrary to be true. Except for those intervals during which Mrs. Yeates was too ill, she attended to her own property and her business affairs in very much the same manner as she had done before 1941. She knew what she wanted and she knew how to go about getting it. There is nothing in the will itself that would indicate the contrary.

■ The contention that the will was executed under duress and undue influence exerted on the part of its proponent is also without merit, for "Proof is not admitted of the dispositions having been made through hatred, anger, suggestion or captation." Article 1492 of the Revised Civil Code. See, also, Zerega v. Percival, 46 La. Ann. 590, 15 So. 476; Succession of McDermott, 136 La. 80, 66 So. 546; Succession of Hernandez, 138 La. 134, 70 So. 63; Succession of Schlumbrecht, 138 La. 173, 70 So. 76; and Succession of Price, 172 La. 606, 134 So. 907.

■ We think, too, the evidence unmistakably shows the decedent wanted her son Clifton to have all of the property she owned at her death and it is our opinion that the deed of June 25, 1941, was nothing more than a donation in disguise executed in the form of a sale for the purpose of accomplishing that which was forbidden by law and, as such, that it is invalid since Mrs. Yeates, the donor, reserved to herself the usufruct of the property, including her right to collect rents, in violation of the express provisions of Article 1533 of the Revised Civil Code. Moreover, the value of the property thus donated, when added to the proportionate interest Clifton Yeates would inherit with his sisters under the will and the disposable portion given him as an extra portion, exceeds the amount to which he is legally entitled under the law, and infringes upon the legitime of the other heirs.

Our conclusion that this is a donation in disguise has been arrived at only after a most careful and close study of the entire record. As previously pointed out, Mrs. Yeates tried to give her son Clifton all of her property by will and deeded this property to him when she was informed such a will would be illegal, for a purported cash consideration of $1,000, in addition to the alleged services rendered by him. Although the appellee testified this consideration was paid by check, under further cross-examination he stated the money had been withdrawn from his savings account, apparently for the purpose of supplementing his checking account to cover the amount of the check. In so far as this transaction is concerned, he is not corroborated by the testimony of any other witness or by any other concrete evidence. Yeates did not produce the cancelled check to substantiate the fact that he paid his mother this money, as he did in the case of the $750 check forming the consideration of the second transfer of the property. And this despite the fact he agreed to produce the check, together with his bank statements, if ordered to do so by the court and his attorney stated this evidence would be freely made available without the necessity of the attorneys for the appellants securing the same by means of a subpoena duces tecum, as they were preparing to do. Furthermore, we have the bank statements of Mrs. Yeates covering the period from December 1939 through July 1943 and they fail to show where this amount was ever

deposited to her account and there is no evidence to show such a check was ever cashed by her.

That Mrs. Yeates desired to give her son all of her property except such an amount as she considered necessary for her maintenance is, we think, further evidenced by the fact that a few days after her conveyance to him of this property she withdrew from the bank on the four checks heretofore mentioned the additional sum of $1,000, admittedly procured by the appellee without endorsement, and although he states this money was withdrawn at the request of his mother and was actually given to her, we feel constrained to say that his testimony in this respect was, to say the least, most unimpressive. The indifference with which he approached this subject as a witness is entirely foreign to the interest he took in all of his mother's affairs. He says he didn't know what his mother wanted with such a large sum of money, that he didn't ask her, and that he didn't know for what purpose it was used. Besides, there is strong contrary evidence touching upon the manner in which these checks were actually drawn. We have the testimony of one of Yeates's sisters explaining that the checks were obtained in the very surreptitious manner heretofore explained. In addition, we have the testimony of the nurse who was taking care of Mrs. Yeates at this time flatly contradicting Yeate's assertion that at the time his mother signed these checks she was dressed and up and about the house a large part of the

time, for this nurse states most positively that during this entire period Mrs. Yeates was so gravely ill and so extremely weak she was unable to sit up or even be up for 30 minutes at a time without assistance, and that she was never dressed at any time during the 22 days the nurse remained with her except for a bath-robe or house coat that was put about her when she was helped to the bathroom.

We are further fortified in these views for when Yeates realized his sisters knew of the suspicious circumstances surrounding his acquisition of the property and his withdrawal of $1,000 from his mother's account, he reconveyed the property to his mother by deed dated June 14, 1941, executed in the presence of a notary and two witnesses, for a recited consideration of $1,000, yet when he was questioned as to the manner in which this consideration was paid while on the witness stand, he stated the amount had been paid to his mother at a later time when they were alone and not in the presence of the notary and witnesses at the time the act was passed. Obviously, if the defendant had actually paid his mother the $1,000 consideration by check as testified to by him when the property was first transferred and his bank statements would reflect such payment, there would have been no reason for him to reconvey the property to her if he intended to reacquire it later unless, as his sisters thought, the first transaction was a simulation and vulnerable to attack, necessitating the pro-

cedure he subsequently followed in establishing proof that would be unassailable by issuing the $750 check and having it cashed to show actual payment of the recited consideration.

We turn next to the evidence in the record touching on the transaction that occurred only 11 days later, when Mrs. Yeates conveyed the naked ownership of this same property to her son. Here again we find the circumstances surrounding the transaction most unsatisfactorily explained. In his answer to the suit to set aside this conveyance Yeates avers "That the purchase made from his mother was for a good and valuable consideration, *PAID IN CASH, and that his mother needed the funds at that time and used the funds to pay her medical bills* and to maintain herself until her death." On the witness stand he testified he had paid this consideration by a check prepared at the bank by Mr. Harper (Mr. J. E. Harper, President of the Minden Bank & Trust Company) and that he signed it and his mother personally cashed it *in his presence* and in the presence of Mr. Harper, although on further cross-examination he stated he was not present when his mother endorsed and cashed the check, having left her at the bank with Mr. Harper while he went to record his deed. On the trial, also, unlike the check involved in the first purchase of the property, Yeates produced the cancelled check that he had with him when he went into court. But aside from these contradictory statements and this cancelled check, he

is not otherwise corroborated by any of the evidence, and this despite the issue in the case that his mother never received these funds and that this transaction was nothing more than a sham to carry out the mother's desire to favor him. While it was stipulated by counsel for appellee that if Mr. Harper were present he would testify he wrote the check in his bank on the date shown, counsel for appellants only conceded the handwriting in the body of the check was that of Mr. Harper and Mr. Harper was not produced as a witness and therefore did not corroborate the statement of Yeates that his mother was present at the time the check was drawn by Harper and actually cashed it herself and received the money, although he could have been called. Likewise, Yeates could have produced his bank statement, which would have reflected whether or not this amount was ever thereafter deposited to his account, but he did not. (Italics are ours.)

Although in his answer Yeates alleged his mother used this money to pay medical bills and maintain herself during the rest of her life, on the witness stand he was forced to admit under cross-examination that at the time he gave his mother this check and she supposedly secured the cash, all of her medical and nursing bills had already been paid by checks that he himself had drawn on her account. Add to this the fact that Mrs. Yeates was never known to have any large sums of money about her person or her home, and the fact that there is no evidence to show an expenditure

by her of any large sum of money during the remainder of her life. Certainly if all of these transactions were what they appeared on the surface to be, some of these large sums of money—the $1,000 Yeates paid his mother the first time, the $1,000 he withdrew from the bank, and the $750 he paid his mother for the second conveyance —or some portion of them at least, would have been discovered or traced. The fact that the appellee denied knowing what his mother did with the cash and professed to be unconcerend about the matter is unimpressive and entitled to very little credence, particularly since he and his wife were with Mrs. Yeates almost constantly during this period of her life and knew or should have known, if any one did, what became of this money.

■■ Furthermore, we think that it was within the power of Yeates to produce evidence that might have thrown some light on the questioned transactions. For example, Mr. Harper, whom Yeates testified not only drew the $750 check in payment of the transfer of this property on June 25, 1941, but was also present when Mrs. Yeates secured the cash it represented, could have been called to testify that Mrs. Yeates was in the bank at this time, endorsed the check, and personally received the cash. Also, the deposits and withdrawals of the bank accounts of Yeates might have thrown some light on these transactions and on what became of this money. Consequently, having failed in this respect,

we think particularly applicable here the rule enunciated in the case of Bates v. Blitz, 205 La. 536, 17 So.2d 816, that a person failing to call available witnesses possessing peculiar knowledge of facts that are essential to the proof of the case, or to produce more explicit, direct, and satisfactory concrete evidence than that relied on although able to, raises the inference or presumption that the testimony of the absent witnesses would not sustain his contentions and that the concrete evidence, if produced, would prove detrimental to his cause, particularly when the testimony of the person attempting to establish his case has been put in doubt but is susceptible of corroboration. See, also, King v. Atkins, 33 La.Ann. 1057; Crescent City Ice Co. v. Ermann, 36 La.Ann. 841; Pruyn v. Young, 51 La.Ann. 320, 25 So. 125; Nelson v. Vicksburg, S. & P. R. Co., 141 La. 475, 75 So. 212; Rubenstein v. Files, 146 La. 727, 84 So. 33; Toca v. Rojas, 152 La. 317, 93 So. 108; Succession of Rageur, 155 La. 97, 98 So. 853; Perez v. Meraux, 201 La. 498, 9 So.2d 662; Stanley v. Jones, 201 La. 549, 9 So.2d 678; II Wigmore on Evidence (2rd Ed.) 162, Sections 285 and 286; 22 C.J. 115, Section 56; 31 C.J.S., Evidence, § 156, subsec. c, p. 856; 20 Am.Jur. 192, Section 187; and Ann.Cas.1914A, 915.

For the reasons assigned (1) the judgment of the lower court recognizing to be a good and binding conveyance the deed of June 25, 1941, and dismissing the plaintiffs' suit attacking the same, is annulled and set

aside, and it is now ordered, adjudged, and decreed that this deed be and the same is hereby declared to be null and void and set aside, and the property thus sought to be conveyed is ordered returned to the mass of the estate of the decedent, Mrs. S. A. (Alice) Yeates; and (2) the judgment ordering that the last will and testament executed by Mrs. Yeates on January 31, 1942, be admitted for probate is affirmed. The cost of these proceedings is to be paid one half by the Succession of Mrs. Yeates and the other half by the widow of the appellee, Mrs. E. Clifton Yeates, and his son, E. Clifton Yeates, Jr.