112 So.2d 86

Theodore H. MARTIN, Sr.

v.

T. L. JAMES & CO., Inc.

No. 44085.

Dec. 15, 1958.

On Rehearing April 27, 1959.

Rehearing Denied June 1, 1959.

D'Amico & Curet, Sam L. D'Amico, Baton Rouge, Samuel C. Cashio, Maringouin, for plaintiff, appellant and appellee.

Barham & Wright, Ruston, Breazeale, Sachse, Wilson & Hebert, Baton Rouge, for defendant and appellant and appellee.

HAWTHORNE, Justice.

Defendant T. L. James & Co., Inc., had two contracts with the Highway Department of the State of Louisiana for the construction of highways, one designated as the Donaldsonville-White Castle-Plaquemine job and the other the Patterson-Calumet-Berwick job. James entered into a contract with plaintiff Theodore H. Martin, Sr., doing business as Martin Gravel Company, for the purchase of red clay gravel, wash gravel, and wash sand to be used in these projects. The contract for the sale and delivery of these materials was in the beginning an oral one, but subsequently written contracts were prepared at Mr. Martin's request for use in obtaining bank credit, and the existing oral contract was thus reduced to writing. In these contracts Martin agreed to sell, and James agreed to buy, sand and gravel in approximated quantities at a fixed price per cubic yard for each commodity. For the Donaldsonville-White Castle-Plaquemine job Martin bound himself to deliver these commodities by barge at his own expense to either White Castle or Plaquemine and to unload them there at his own expense. For the Patterson-Calumet-Berwick job he contracted to deliver these commodities by barge to Berwick and there unload them at his own expense. Under these contracts T. L. James was to pay for all materials delivered within 30 days of delivery.

Pursuant to these contracts the plaintiff acquired the materials sold to the defendant from pits near St. Francisville and employed independent truck operators to transport these materials to a site on the bank of the Mississippi River near St. Francisville, where they were stockpiled or dumped. From this point the materials were loaded by dragline onto barges, which did not belong to the plaintiff, and thence transported to the points of destination stipulated in the contracts and there unloaded, all at the expense of the plaintiff.

Since Mr. Martin was in need of financial assistance, T. L. James, according to the testimony of its general superintendent in charge of operations, agreed to advance payments to Mr. Martin on estimated delivered quantities with the full understanding that adjustments would be made according to the actual delivery at the places called for in the contracts. During much of the stockpiling and barge-loading at St. Francisville the James Company kept an employee there to check the quantities of materials delivered by plaintiff at that point because it was advancing money to Martin and wanted to verify the

shipments and have some idea of the correctness of the invoices covering the materials which it was purchasing and which were being invoiced to it by Martin. Sometime later plaintiff asked the James Company to free him from his contracts because he was having difficulty in obtaining material that was satisfactory to the highway department, and accordingly by mutual agreement the contracts were terminated.

Defendant paid all invoices submitted with the exception of those dated June 25 and July 2, 10, 14, and 21, 1956, amounting to $20,702.40. Plaintiff brought suit for this amount, alleging that it was a balance due for sand and gravel delivered to the defendant, and also sought judgment for $5,852.90, the amount of sales tax which he alleged James was to pay, and $50,000.-00 as damages to his credit and reputation because of James' failure to pay for the materials delivered.

Defendant James denied the indebtedness and reconvened claiming that it had paid Martin on the basis of his invoices, and that these invoices called for payment for more sand and gravel than had actually been delivered. The return of such overpayment was demanded, and in brief filed in this court James contends that the amount of this overpayment is, at the very least, $25,693.54. It also in its reconventional demand sought additional sums because of necessary expenses incurred in connection with the contracts for which it alleges Martin is responsible and for which it ought to be reimbursed, one of these being an item of $1,750 paid by it in behalf of Martin as rental for a dragline from May 2 through June 7, 1956.

After a lengthy trial in the lower court judgment was rendered rejecting both plaintiff's demand and defendant's reconventional demand. This judgment, however, reserved to the plaintiff the right to be reimbursed by the defendant for any sales tax and penalties which he might have to pay to the State of Louisiana on the gravel and other materials sold to the defendant. It non-suited defendant's reconventional demand in which defendant sought $1,750 for rental of the dragline. Both plaintiff and defendant appealed.

In our minds this case presents a question of fact: How much sand and gravel was delivered by the plaintiff to the defendant pursuant to the terms of the contracts?

It must be observed at the outset that neither plaintiff nor defendant actually made any measurements of the quantities of materials at the points of destination called for in the contracts, that is, White Castle, Plaquemine, and Berwick.

In his effort to establish the amount of sand and gravel delivered to the defendant plaintiff relies on the fact that these materials were transported from the pits in

five-cubic-yard trucks and stockpiled on the river bank at St. Francisville. In getting the total amount which he says was delivered he counted the number of truck loads placed on the stock pile on the river bank at St. Francisville, and argues that this represents the total amount delivered because title to the sand and gravel at that time vested in the defendant, even before the material was loaded on the barges for transportation to the various points at which he was obligated to deliver it under his contracts. He further sought to establish the quantity by the number of barge loads delivered multiplied by the capacity of the barge.

These methods of computation are totally unsatisfactory. The evidence in this case discloses that not all of the trucks were loaded with five cubic yards of material, and plaintiff allowed nothing for spillage between the gravel pit and the stock pile. Also, he allowed nothing for loss or spillage in transferring the materials from the stock pile at St. Francisville to the barges, and nothing for any loss incurred at the points of unloading. Moreover, in many instances the barges were not loaded to capacity.

There is no merit whatever in his contention that title to these materials vested in the defendant on the river bank at St. Francisville, for by the plain terms of his written contracts he was to deliver this sand and gravel at his own expense to the points designated, of which St. Francisville was not one. However, even if for the sake of argument we were to concede that Martin stockpiled at St. Francisville the exact amount of sand and gravel which he is now contending he sold to the James Company, Martin would not benefit by this fact unless he could also prove that he delivered these exact amounts of sand and gravel to the James Company. Article 2467 of our Civil Code provides that as soon as the contract of sale is complete, the thing sold is at the risk of the buyer, but Article 2468 states that until the thing sold is delivered to the buyer, the seller is obligated to guard it as a faithful administrator, and that if through his want of care the thing is destroyed or its value diminished, the seller is responsible for the loss.

The burden was on plaintiff to establish the quantity of sand and gravel sold and delivered by him to the defendant, and it was incumbent upon him to prove by a preponderance of evidence that the quantity of sand and gravel for which he is seeking recovery was actually received by the defendant at the delivery sites as stipulated in the contracts. This he has failed to do.

On the trial plaintiff sought to offer evidence on his claim for $50,000 damages as an injury to his reputation and credit because of the failure of the defend-

ant to pay for the materials sold when payment became due. Defendant objected to this evidence, and the objection was sustained by the trial judge. We think the judge was correct in sustaining the objection under Article 1935 of the Civil Code, which provides:

"The damages due for delay in the performance of an obligation to pay money are called interest. The creditor is entitled to these damages without proving any loss, and whatever loss he may have suffered he can recover no more."

█ In any event, however, before plaintiff could prove that he was entitled to damages because of defendant's failure to pay, he would have first had to prove that the defendant actually owed him the amount claimed. This he has not done.

With reference to the $5,852.90 claimed by Martin for sales tax and penalty due the State of Louisiana, the trial judge found that this tax had not been paid by anyone, that the James Company had agreed to pay the tax, and that Martin was justified in assuming that the company would pay the tax directly to the state. But the trial judge did not give Martin judgment on this item because he was of the opinion (a) that the amount of the tax and the payment thereof were matters to be determined by the state, and (b) that there was a dispute between petitioner and defendant as to the actual amount of gravel

that was sold to defendant by petitioner, defendant's figures being supplied by the State Department of Highways, and that "until the matter is adjusted contradictorily with the State of Louisiana, this Court cannot arrive at a correct figure for the tax". However, the trial judge reserved to Martin as against T. L. James & Company the right to reimbursement for any tax and penalties that Martin might be required to pay to the State of Louisiana on the materials sold to defendant. We are in full accord with this ruling.

█ With reference to James' reconventional demand in which it claims it paid Martin on the basis of invoices which called for payment of more sand and gravel than had actually been delivered and seeks judgment in the amount of these overpayments, the trial judge had this to say:

"The defendant, itself, made and kept no measurement of the road material supplied to it by Mr. Martin. The method employed by the defendant in arriving at the amounts of the claimed shortages is simply to take the total figures supplied to it by the Department of Highways of materials used in the road project, and deduct the amount of materials bought from and supplied by a number of other suppliers, and then by a complicated system of allowances for moisture content, stockpile losses, recoveries from a cave in, it comes up with a figure which represents the amount of material

supplied by Mr. Martin, and thereby determines his shortage. The evidence shows that T. L. James & Co., Inc. purchased much material on these two road projects from others than Mr. Martin, and there is nothing to convince this Court that the measurements of material supplied by such parties were any more accurate than those made by Mr. Martin. The whole picture presents a matter of too much speculation and uncertainty to justify this Court in rendering a judgment on the reconventional demand as to the claimed material shortages."

In this court counsel for James maintain that the trial judge misunderstood their evidence, and that the James Company itself had made careful measurement of the sand and gravel which it purchased from suppliers other than Martin. Even if we concede that James' measurements were carefully made, there is still too much speculation in James' argument. If James wanted to know exactly how much material it was getting from Martin, it should have weighed and measured all the material as it was received, just as the highway department does, for that is the only reliable way to check on the quantity.

As to the item of $1,750 claimed by James as rental for a dragline paid on behalf of Martin, the trial judge correctly said:

"* * * The most serious of the items listed * * * is that of 'Payment to J.

V. Pearson—Rental on dragline May 2, 1956 thru June 7, 1956'. This came about because Mr. Martin asked James to locate for him a dragline to be used at St. Francisville, which was done. The operator or owner of the dragline knew it was for Mr. Martin, but since James had asked Pearson to supply the dragline, James paid him. Mr. Martin contends that the charge was excessive, or that he has a legitimate claim against Pearson, and that he could have and would have properly adjusted the matter with Pearson. Martin contends, therefore, that to force him to pay the full amount to T. L. James & Co., who paid the bill without his consent or authorization, would deprive him of his legal rights and defenses as against the charge. It is believed that there is merit in this contention. It is also doubtful that this item is set out with sufficient clarity and detail to justify proof thereon. Consequently, as to this item, the demands of the defendant, T. L. James & Co. Inc. will not be rejected, but only dismissed without prejudice."

The other items claimed in the reconventional demand were disallowed by the trial judge either because the evidence adduced to prove them was too vague and indefinite or because the expenses for which defendant claimed reimbursement were not obligations of the plaintiff under the contracts. We think the rulings on these items were correct.

The judgment appealed from is affirmed.

On Rehearing

FOURNET, Chief Justice.

■ We granted a rehearing in this case on plaintiff's application [1] to re-examine the record in order to ascertain whether he is entitled to recover (a) for certain sand, red clay gravel and washed gravel allegedly furnished under his agreement with the defendant, T. L. James & Co., Inc., and (b) for taxes due the State on such sales.

As observed in our original opinion, the contract for the sale and delivery of these materials was, in the beginning, an oral one, but was subsequently reduced to writing in order to accommodate plaintiff in obtaining bank credit. According to the terms of two similar written instruments, [2] executed in March of 1956 (one for delivery of the material to Plaquemine or White Castle, the other for delivery to Berwick, La.), the plaintiff agreed to sell to defendant and the latter agreed to purchase stated approximate quantities of red clay gravel, washed gravel, and washed sand, at a fixed price per cubic yard for each material, for which defendant agreed

to pay "within 30 days of delivery." Plaintiff was to deliver the material by barge and unload it, at his cost, on locations at the water's edge designated by defendant. The written contracts, which were merely a continuation of the oral agreement, contained no stipulation evidencing the intention of the parties as to the manner in which this material was to be measured, but when deliveries were first begun in September, 1955, the pattern was established by measuring the capacity of the trucks into which the material was loaded at the pit; [3] thereafter, upon each truckload being driven to a nearby location on the river bank at St. Francisville and dumped on a stockpile (for convenience in loading on the barges), each truck driver was given a ticket bearing the date and his truck number (a duplicate thereof was retained by the "checker"), and upon surrendering their tickets the drivers were paid for their labor. The tickets were then used—each representing five cubic yards of whatever material had been hauled—in billing the defendant, were attached to plaintiff's invoices, and sent to the field office nearest the highway project to which the material was then being delivered. [4]

---

1. The defendant did not ask for a rehearing; therefore the judgment as to its reconventional demand is final.
2. These were signed by plaintiff and by George Williams on behalf of the defendant. Williams was defendant's General Superintendent, and all transactions were conducted through him.
3. These trucks, which belonged to various individuals and were driven by their em-

ployees, were in the main of five cubic yard capacity.
4. The invoices were usually submitted in a form identical with or similar to the following: "2,000 yds Creek Gravel, $6,000; Tickets Nos. 10801 thru 11200" or "2,-000 cu. yds. Washed Gravel @ $3.00 yd., $6,000; 400 tickets @ 5 yds. each—2,000 cu. yds."

The job superintendent received the material, he and the office manager approved the invoices and made requisition for payment to the main office in Ruston. Accounts were handled in this fashion for a period of some eight or nine months; plaintiff then informed the defendant that he could no longer obtain gravel to meet the State's specifications for highway material. All of the invoices up to that time had been paid in full, leaving unpaid only those of June 25, July 2, 7, 10, 14 and 21, in total amount of $20,702.40.

The reason given by defendant for not paying the last invoices is that at that time it realized it had paid plaintiff for more material than had been used in the road construction job, as indicated by Highway Department's measurement of material received from the defendant. According to the version of defendant's General Superintendent, George Williams (the man who made the agreement), the defendant was to pay plaintiff on the invoices as submitted, but such payment was made subject to verification based on the Highway Department's actual measurement of material used on the job, and the agreement was to be modified and corrected accordingly; and when notified by plaintiff that he could no longer supply material, that is when defendant stopped paying him. Plaintiff, on the other hand, claims that he was paid strictly in accordance with their agreement, and denies there was to be any subsequent modification or adjustment.

In order to determine which is correct, we have again examined the entire record. While the testimony is most difficult to follow, lacks continuity and clarity, is inconclusive, contradictory in many instances and confusing in others, from a perusal of the testimony and exhibits we think that the evidence preponderates in favor of the plaintiff's contention.

This conclusion is corroborated by the fact that from the very beginning and at intervals throughout the operation the defendant constantly caused checks to be made at St. Francisville to see that full measurement was being maintained, and is consonant with the expressed provision of the contract that payment would be made "within thirty days of delivery," and the further fact that the system of measurement relied on in this case, i. e., use of "five-yard" trucks and the issuance of tickets on each truckload was, as found by the trial judge, admittedly the method "in general use by those in the gravel business in determining the amount of gravel handled." While the record is not clear as to when the trucks were first measured for their capacity, or by whom, it is replete with instances where the defendant had spot checks made of the trucks on the job. The first man employed for checking purposes, Frank Russo, testified

that for the first five months of the operation he checked gravel for the defendant, saw that the trucks were loaded to proper capacity, caused the material to be dumped in stockpiles of one or two thousand cubic yards, supervised the loading on barges and saw that the stockpiles were well cleaned off; thereafter the checkers of the trucks were spot-checked from time to time by disinterested persons who were sent by the defendant. For example, during the first part of April, 1956, at the request of defendant George Williams, Johnson · Barrow (engaged in private business elsewhere) went to St. Francisville, measured the trucks then in use and gave each driver written dimensions of the truck he was driving; [5] on the 24th of April he returned, again for the purpose of measuring trucks (but no hauling was being done). The next check was made a few weeks later by ·T. D. Enete, who conducted his own business in St. Francisville and who testified that he was asked specifically to investigate, check and report to defendant. Stating that his checking was done as though he were actually buying the gravel for Mr. · Williams and that his investigation covered a period of several days, a total of forty working hours—during which time he measured the capacity of the trucks with a slide rule, made sure they carried full loads before being unloaded in stock piles of 1,000 cu. yds., saw that the barges were properly loaded and that no material was left on the ground, and he reported accordingly.[6]

That the plaintiff was supposed to deliver the material at the plant site in quantities of 2,000 cu. yds. on two barges each shipment cannot be disputed by the defendant, for its own witness, Buford Saxon, plant foreman of the asphalt plant at White Castle, reported to W. M. McGee, his immediate superior, that although defendant was supposed to be getting 2,000 cu. yds. of material on two barges each shipment, the barges were arriving far short. Thereupon McGee, having received orders to see that the material they were being billed for was actually received, caused a special bin or hopper to be constructed at the un-

5. The testimony of this witness indicates that five trucks were hauling on the day he made his measurements; of those he measured, one made only one trip, another had a five yard capacity, and "the other the bed was not five yards;" that none carried five yards of gravel; and that he made an average of the amounts hauled over two round trips which resulted in a deficiency of "about thirteen point one per cent." There is no showing that defendant was given a report of ·

6. The testimony of this witness was to the effect that the drivers were anxious to keep their loads to the required measurement, and while some truckloads were under five yards, others were over, so that one measurement compensated for the other—to within one yard in a thousand, according to his actual check and computation.

his findings, that it protested payment of an invoice during this period, or that the deficiency was of usual occurrence.

loading site on the levee near White Castle, at a cost to defendant of $1,195; from the barge, the material was unloaded by dragline directly into the bin and flowed through into a five cu. yd. truck underneath; thus, a count of the truckloads showed the amount received. While this witness said that six bargeloads of material were were checked in this fashion—two of which were "short" barges, plaintiff having advised that due to plant trouble he had not been able to load fully and was sending the barges as they were, two others carried about 1,650 cu. yds., and two came in with 1,955 cu. yds.—he does not relate the measurements to any date or to any particular shipments, stating only that the records were in the office of the defendant. This testimony was taken by deposition, and so far as we have been able to find, the records to which the witness referred were neither identified nor produced in evidence. We note, however, that McGee stated he went to White Castle in mid-February, 1956, that the bin was constructed after his arrival, that the measurements were made of material brought on the two large barges on which plaintiff was shipping washed gravel; and we find, on plaintiff's Exhibit A attached to the petition, that on April 12, 1956, a shipment of washed gravel was made to White Castle, the charge being for 1,655 cu. yds.

Other than this, apparently no sustained attempt was made to measure the material delivered by dragline from the barges. At the defendant's request representatives of Pittsburg Testing Laboratory on two occasions measured barges, once at White Castle on March 22 and the other time at Calumet on June 28, 1956. The report of the first measurement, introduced as Exhibit D–12, is not in the record, and at its place is a notation by the Court Reporter, "This laboratory report is missing from the exhibits." The report of the second measurement shows that a barge, the TJ 68, was checked at Calument slip and the load was calculated at 884 cu. yds. Evidently in connection with this measurement, defendant's asphalt plant superintendent at Berwick called the plaintiff by phone, advising of their intention to measure the barge which had just arrived and asking if plaintiff wished to send a representative, to which plaintiff had replied, "Just go ahead and pay for what the measurement was." It is noted that plaintiff's invoice for shipment of that date is for exactly the amount of 884 cu. yds. And supporting plaintiff's explanation that, due to an accident to a large barge, toward the end of the operation smaller barges had to be used, is the fact that plaintiff's invoices covering the last four shipments show that the defendant was billed for short measurements, i. e., 1,700 cu. yds., 1,700 cu. yds., 1,700 cu. yds., and 850 cu. yds. Another of defendant's key employees, Raymond Allen, a project superintendent who was

on the job during the entire period, admitted that he never complained at any time that shortages occurred in the deliveries by barge.

Clearly there would have been no occasion for all of this checking unless for the purpose, as stated by McGee, to see that the defendant was getting all of the material for which it was being invoiced. George Williams' version of the parties' agreement—i. e., that payment for the material was made subject to verification and modification at the completion of two highway construction projects and was to be based on final measurement by the Highway Department, at which time plaintiff would re-invoice defendant for the additional yardage or replace any shortage that developed—is neither in keeping with the manner in which the whole transaction was conducted nor to any degree supported by the record. Moreover, it would not be compatible with the express provision of the contract requiring that the material be paid for within thirty days of delivery.

From this it follows that in as much as the defendant made no further measurement of the material, it must have been

satisfied that the deliveries contained material in accordance with the invoices, which were being accepted and approved for payment. The method relied on by the defendant for computing the material received from the plaintiff was, we think, as did the trial judge, too complicated and uncertain, and presented a matter of too much speculation.[7]

The Articles of the Civil Code on which the defendant relies have no application; they deal with the obligation to restore, by one who receives what is not due (Article 2301), the right to reclaim that which has been paid through mistake (Article 2302), and the damages which can be recovered for delay in performance of an obligation to pay money (Article 1935). Nor is the case of Milliken & Farwell v. American Sugar Refining Co., 143 La. 667, 79 So. 214, 215, relied on by defendant as "on all fours" with the instant case, of any assistance. In that case the plaintiff-seller was denied recovery for sugar shipped by barge and lost upon arrival at destination because there had been no compliance with the parties' contract that the sugar was "to be sampled, weighed and

---

7. In this connection the trial judge observed: "The defendant, itself, made and kept no measurement of the road material supplied to it by Mr. Martin. The method employed by the defendant in arriving at the amounts of the claimed shortages is simply to take the total figures supplied to it by the Department of Highways of materials used in the road project, and deduct the amount of materials bought from and supplied by a number of other suppliers, and then by a complicated system of allowances for moisture content, stockpile losses, recoveries from a cavein, it comes up with a figure which represents the amount of material supplied by Mr. Martin, and thereby determines his shortage. * * "

tested, according to the usual custom, upon arrival;" and the Court rejected plaintiff's contention that there had been acceptance of delivery because the loaded barge had been moved from wharfside and tied to the ship's side (where the loss and damage occurred) at the suggestion of defendant's superintendent. In the instant case delivery was made and accepted, there was no loss or damage; and while defendant had the right to measure in order to insure that it was receiving the quantities for which it was being billed, it cannot now, after having accepted and used the material, successfully claim there was a shortage when it failed to show actual measurement to prove such shortage. Under a long line of jurisprudence of this Court, defendant's failure to produce the reports made by its superintendent McGee so as to show results of his measurement of particular barge-loads raises the presumption that the evidence, if produced, would have proved detrimental to its cause. Bates v. Blitz, 205 La. 536, 17 So.2d 816; Succession of Yeates, 213 La. 541, 35 So.2d 210, and numerous authorities cited therein.

We think the matter of plaintiff's claim for sales taxes was properly disposed of in our original opinion.

For the reasons assigned, the judgment of the lower court, insofar as it rejected the demands of the plaintiff on his claim for certain red clay gravel, washed gravel and washed sand, delivered under his agreement with the defendant, and ordering that the costs be paid equally by the plaintiff and defendant, is annulled and set aside; and it is now ordered, adjudged and decreed that there be judgment in favor of the plaintiff, Theodore H. Martin, Sr., and against the defendant, T. L. James & Co., Inc., for the full sum of Twenty Thousand Seven Hundred and Two and 40/100 ($20,702.40) Dollars, with legal interest from judicial demand, and for all costs; in all other respects the judgment appealed from is affirmed.

HAWTHORNE, J., dissents with written reasons.

HAWTHORNE, Justice (dissenting).

I respectfully dissent from the majority decision in this case for all the reasons set out in my decision on original hearing.

Under the written contract Martin was supposed to deliver this material at designated points at the seller's expense, the designated points being Berwick, Plaquemine and White Castle. As I view the matter the measurements were made at St. Francisville solely because the seller asked for financial aid in the form of advances on his contract, which he received as a favor, and the buyer kept a checker at St. Francisville so that it would have a general idea of the correctness of the invoices which it was paying. Rough measurements were made at St. Francisville with

the distinct understanding that final accurate measurements were to be made by the Department of Highways, to which the materials were delivered by James, and also with the understanding that the seller, Martin, would re-invoice James for any additional yardage, or replace any shortage that developed, Before all of the materials had been delivered by Martin under these contracts, however, Martin himself asked James to free him from his contract because he was having difficulty in obtaining material that was satisfactory to the Highway Department, and James consented.

Under the contract James was bound to pay only for the amount of material delivered in accordance with the terms of the contract. Why should James measure and accept material at the point of origin and assume the risk of loading and unloading and a long water haul when the contract itself specified that Martin was to deliver the materials to Berwick, Plaquemine and White Castle at Martin's expense? Martin *knew* that the materials belonged to him until delivered in accordance with the terms of the agreement because he insured himself against the risk of losing these materials between St. Francisville and the unloading sites. In fact this record shows that Martin actually lost one thousand yards of creek run gravel when a tugboat hit one of his barges on the Atchafalaya River en route to an unloading site, and at the trial of this case Martin admitted that

the insurance company paid him for the lost gravel. By insuring and collecting for these materials Martin showed that he himself *interpreted the contract* to mean that the materials were at his risk until delivered to the sites called for in the contract.

Rehearing denied; McCALEB, J., HAWTHORNE, J., and HAMLIN, J., dissenting.