253 So.2d 614 (1971)
John R. KRISON, Plaintiff-Appellee,
v.
TEXAS INDUSTRIES, INC., et al., Defendants-Appellants.
No. 11684.
Court of Appeal of Louisiana, Second Circuit.
October 12, 1971.
*616 Hargrove, Guyton, Van Hook & Ramey, by Ray A. Barlow and Cecil E. Ramey, Jr., Shreveport, for Texas Industries, Inc., and Louisiana Industries, Inc., defendants-appellants.
Feist, Schober & Howell, by John L. Schober, Jr., and James Fleet Howell, Shreveport, for appellee.
Before AYRES, PRICE, and HALL, JJ.
AYRES, Judge.
Plaintiff, John R. Krison, by this action seeks to recover from his former employer, Texas Industries, Inc., and its subsidiary, Louisiana Industries, Inc., in solido, (1) the sum of $16,800.00, one year's basic salary, as termination pay under a supplemental employment agreement entered into by plaintiff and the first-named defendant; (2) the sum of $420.00 as wages due him for the period of February 1 through February 9, 1970; and (3) penalties and attorney's fees under LSA-R.S. 23:632.
The trial court awarded plaintiff judgment as prayed for except for penalties and attorney's fees which were denied. Plaintiff's recovery, however, was subject to a credit of $712.95, an amount for which plaintiff was indebted unto defendant Texas Industries, Inc. Defendants appealed from the judgment. Plaintiff answered the appeal and prayed that the judgment be *617 amended to allow penalties and attorney's fees.
Defendants specify as error the action of the trial court in finding that they were liable in solido to plaintiff for the sum of one year's salary as termination pay because:
(a) Plaintiff did not carry the burden of proof in establishing with certainty and by a preponderance of the evidence that a contract providing for such termination pay had been perfected;
(b) The alleged contract contained an error as to an essential fact which plaintiff recognized and sought to take advantage of;
(c) Admitting, arguendo, that such a contract had been perfected, plaintiff was discharged for cause and no termination pay was due; and
(d) Even if it could be found that plaintiff was entitled to termination pay due under the contract, termination pay was to be calculated in accordance with uninterrupted length of service, and plaintiff's total length of service with defendant, or any concern which has been acquired by defendant, was less than fifteen years, the length of time necessary to entitle plaintiff to the amount awarded by the district court.
Defendants further contend the trial court erred in its failure to find that plaintiff was discharged effective January 31, 1970, and by allowing him wages for the period of February 1 through February 9, 1970.
The basis for plaintiff's main demand is a supplemental employment agreement allegedly entered into on or about June 15, 1962. By letter of that date the president of defendant Texas Industries, Inc., requested that plaintiff, a sales representative of defendant at that time, enter into a noncompetitive agreement, in return for which the defendant agreed to pay to plaintiff termination pay based upon his years of service if he should be terminated for reasons other than certain specified causes. Plaintiff was requested to sign both the letter outlining the proposal and the attached supplemental employment agreement and to return both to defendant. The supplemental employment agreement obligated plaintiff not to compete with defendant for a period of two years, after termination of employment, within a fifty-mile radius of Alexandria, Louisiana. The letter to which the supplemental employment agreement was attached provided for termination pay in accordance with a schedule which allowed amounts ranging from one month's salary for those employees who had been with the company more than six months, but less than three years, to a full year's salary for those employees who had been employed more than fifteen years at the time of termination. The supplemental employment agreement provided that as the basis for determining plaintiff's termination pay it was agreed that as of "December 1961," plaintiff had accumulated eleven years of service with the company.
An employee who signed the supplemental employment agreement and who was subsequently terminated was entitled to the termination pay unless his termination resulted from "dishonesty, willful negligence in the performance of duty, or any other willful activity which causes discredit to the Company or causes substantial harm to the Company."
Blank spaces were provided on the second page of the letter and on the supplemental employment agreement for the signature of the employee and for the date. The signature of the company president appeared on the second page of the letter, but no company representative signed the supplemental employment agreement.
Defendants first contend that the letter of June 15, 1962, and the supplemental employment agreement were not timely executed and returned by plaintiff. Plaintiff testified that the original of the letter and *618 the attached original of the supplemental employment agreement, along with an onionskin copy of each, were handed to him by L. D. Fain, his superior at the Alexandria operation of defendant where he was working at the time. After examining the letter and the agreement, he decided to sign them, particularly in view of the fact that in the agreement he was credited with eleven years of service for the purpose of computing termination pay, whereas he actually had worked fewer years. Eleven years had elapsed since his initial employment. He testified that he signed the agreement and the letter and returned both to Fain, or to Fain's secretary, Mary S. Gremillion, within a few days of their receipt. He candidly admitted that he did not sign the onionskin copies, which he retained in his personal files, until he was terminated. These copies, bearing his signature, were admitted into evidence.
A review of plaintiff's employment record, which was maintained by defendant's personnel office, disclosed that plaintiff was initially hired by Central Culvert Company, Alexandria, on December 20, 1950. This company is now known as Louisiana Industries, Inc., a Louisiana corporation, and is a wholly owned subsidiary of defendant Texas Industries, Inc. Plaintiff voluntarily left his employment with Central Culvert Company on July 15, 1957, but returned as an employee on November 1, 1961. From that date until his termination, plaintiff was continuously employed by defendant Texas Industries, Inc., or one of its wholly owned subsidiaries.
Fain testified by deposition that he did not recall plaintiff's returning the documents to him; however, he could not testify that plaintiff did not do so. Fain also testified that if plaintiff did return the documents to him it would be strange if he did not immediately forward them to the Dallas home office.
Wendell P. Logan, vice president of defendant Texas Industries, Inc., in charge of personnel, testified by deposition that employment agreements such as this were usually kept in the files of the company's law department in Dallas, but that the agreement with plaintiff could not be found in these files or in any other company files. He admitted that the agreement in question could have been received by Ralph B. Rogers, the company president and the man whose signature appears on the letter of June 15, 1962.
As additional evidence that plaintiff did not have such an agreement, the defendants introduced into evidence an interoffice memorandum dated April 2, 1969, which was addressed to plaintiff and other management-level employees. This memorandum pointed out that the company policy of requesting that sales representatives sign noncompetitive agreements had recently been extended to management personnel, and that plaintiff was one of the management-level employees who had not signed a noncompetitive agreement. The addressees were requested to obtain the signatures of the personnel under their jurisdiction who had not yet signed.
Defendants correctly argue that the burden of proving the existence of the contract is on plaintiff, and they contend that plaintiff has not borne the burden of proving that he timely accepted the company's offer.
The question of whether the largely uncorroborated testimony of plaintiff is sufficient to bear this burden of proof immediately arises. Despite the lack of direct, corroborating evidence, plaintiff's claim is supported in a limited sense by certain facts. It is not disputed that the defendant did make the offer to plaintiff. That he retained the onionskin copies in his personal files for almost eight years after he contends that he signed and returned the originals is, at least, an indication that the originals had some importance to plaintiff. We can imagine no reason for his retaining these copies other than as evidence of an agreement with his employer. Too, plaintiff readily produced these copies once this situation developed and the questions of termination pay became important.
*619 The inter-office memorandum of April 2, 1969, which listed plaintiff as one of the management-level employees who did not have a noncompetitive agreement with the company is probative of one thing, i. e., that he did not have a management-level noncompetitive agreement. It does not prove that he had not signed a noncompetitive agreement in June, 1962, when he was still a salesman. The fact that no copy of the agreement could be found is not conclusive evidence that no such agreement existed.
Citing Jarrett v. Climatrol Corporation, 185 So.2d 63, 64 (La.App., 4th Cir. 1966), and Jackson v. Jackson, 212 So.2d 265, 266 (La.App., 4th Cir. 1968), plaintiff contends that the failure of defendants to call as witnesses either Ralph B. Rogers, the company president, whose signature was on the letter of June 15, 1962, or Mary S. Gremillion, Fain's secretary, creates a presumption that their testimony would have been unfavorable to defendant. This presumption is supported by the fact that no one having custody of or familiar with the files and records of defendant's law department, where records of the character here involved were said to be kept, was produced as a witness. Nor was it shown that such a person made a search of those records.
In Jarrett, the court stated that the failure of the corporation president to appear on behalf of the corporation when he was apparently readily available to do so permits an inference that his testimony would have been detrimental to the corporation's case. In Jackson, the court held that where a litigant does not produce a witness available to him and no reasonable explanation is offered for the failure to produce the witness, the presumption is that the witness would have been unfavorable to his case.
In light of the testimony of Logan that it was possible that the agreement in question might have reached Rogers, and that the agreement was not in the files where it should have been found, it would appear that testimony from Rogers that he had not received the signed agreement from plaintiff would tend to prove defendants' contention that plaintiff never executed and returned the agreement. Taking into consideration plaintiff's testimony that he returned the signed agreement to either Fain or Mrs. Gremillion, and considering Fain's testimony that he could not remember whether it was given to him or not, it would seem that testimony by Mrs. Gremillion that she had not received the signed copy from plaintiff would strengthen defendants' position. In the light of the established jurisprudence of Louisiana, and taking into consideration the facts, or the lack thereof, surrounding the existence of the agreement allegedly signed by plaintiff, we can only conclude that the testimony of Rogers and Mrs. Gremillion would have been detrimental to defendants' case.
The resolution of this factual issue depends largely upon the credibility of the witnesses and particularly of plaintiff. The rule in Louisiana is that, in the absence of manifest error, the trial judge will not be reversed on questions of fact, especially when the questions of fact have been resolved by the testimony of witnesses who appeared before the trial judge. Orlando v. Polito, 228 La. 846, 84 So.2d 433 (1955).
In the instant case, our careful review of the voluminous record does not disclose that the trial judge was manifestly erroneous in his findings of fact on the question of whether plaintiff did timely execute and return the agreement. Our conclusion, like his, is that plaintiff did timely execute and return the supplemental employment agreement.
Defendants next contend that no binding contract came into existence because the supplemental employment agreement contained an error as to an essential element, i. e., the length of time of plaintiff's service.
The evidence shows that the agreement credited plaintiff with eleven years of *620 service as of December, 1961. Plaintiff readily admitted that he did not have eleven years of continuous service at that time and that he was aware that the agreement credited him with more years than he actually had. December, 1961, did, however, mark the eleventh anniversary of his initial hiring by a subsidiary of defendant. Wendell P. Logan, director of personnel for defendant Texas Industries, Inc., testified that he and someone in the law department prepared the form of the agreement, but that the agreement which plaintiff received was actually prepared for the signature of the company president by one of two secretaries. Citing company policy that for the purpose of calculating termination pay, no credit was allowed for employment prior to the last-hire date, Logan asserted that a clerical error had been made when eleven years were credited to plaintiff. These contentions are beyond and outside the language of the contract and contradictory thereto. No fraud or error in the confection of the contract has been established. Hence, oral testimony is not admissible to contradict, alter, vary, or add to the terms of the contract. Nevertheless, reference will be made to the several contentions made by the parties.
Plaintiff's position is that the agreement did not purport to establish the actual number of years he had been employed, but rather was intended to stipulate that for purposes of computing termination pay he was to be credited with a certain number of years of service. In order to encourage his signing, he was credited with more years than he actually had worked. He testified that this was a factor in his decision to sign the agreement.
There is no doubt that consent to a contract may be vitiated by an error of fact and that without consent there is no contract. LSA-C.C. Arts. 1797 and 1819. It is equally certain that parties to a contract may stipulate as they please and that the stipulations form the law between the parties and should be enforced so long as they do not contravene good morals or public policy. Leiter Minerals, Inc., v. California Company, 241 La. 915, 132 So.2d 845 (1961).
Although the testimony of Logan concerning defendant's policy would indicate that the crediting of plaintiff with eleven years of service did result from a clerical error, defendant, however, offered no testimony to rebut plaintiff's equally logical argument that he was credited with eleven years of service as an inducement for his signing the agreement. The company president was not called to establish if he intended to credit plaintiff with eleven years of service or if he even read the agreement before it was sent to plaintiff. The two secretaries, one of whom prepared the agreement, were not called to testify as to whether plaintiff was credited with eleven years of service through error or design. Testimony from these persons could have established with more certainty than did Logan's testimony if there was a clerical error. The statement of law in Jarrett v. Climatrol Corporation, supra, and Jackson v. Jackson, supra, again justify a presumption that testimony of these witnesses would have been detrimental, or unfavorable, to defendants' case.
Under the facts and circumstances of this case we find defendant has not shown that an error was made as to an essential element of the contract, a contract prepared solely by it. Rather, we find that defendant is bound by what it placed in the contract, particularly where plaintiff had reason to believe that defendant had knowingly credited him with more years of service than he had as an incentive for his signature.
Closely related to the above question is defendants' contention that plaintiff is entitled to termination pay calculated on the basis of uninterrupted length of service or, in the alternative, termination pay based upon the total years of actual service. The obvious answer to this is the wording of the agreement between plaintiff and defendant. It states, "For the basis of computing any termination pay which may be payable to me by the Company in accordance *621 with its commitment, I agree that on December, 1961, I have accumulated eleven (11) years of service with the Company." The agreement established a certain number of years of service as a basis for computing plaintiff's termination pay; it did not attempt to state how many years plaintiff had actually worked.
It is not disputed that plaintiff worked for defendant from November, 1961, until his termination in early 1970, a period of over eight years. By simply adding these eight years to the eleven years plaintiff was credited with as of December, 1961, it is apparent that plaintiff has a total of well over the fifteen years necessary to entitle him to one year's basic salary as termination pay. We agree with the trial court's finding that plaintiff is entitled to $16,800.00 as termination pay.
This brings us to the question of whether plaintiff was terminated for cause as specified in the agreement, thus disqualifying him for termination pay. Defendant contends that plaintiff was discharged for "dishonesty, willful negligence in the performance of duty or other willful activity which causes discredit to the Company or causes substantial harm to the Company." The events immediately preceding plaintiff's dismissal occurred on Friday, January 23, 1970. The Shreveport plant was making a large pour of concrete at the construction site of the new General Electric plant. To assist in this work, several trucks had been sent from defendant's Alexandria plant and J. Nelson Ball, plaintiff's superior, instructed him to keep the trucks in Shreveport over the weekend if they would be needed on Monday. Plaintiff testified that he gave these instructions to the local dispatcher, the man who would know if the trucks would be needed on Monday and who controlled the trucks. Somehow the trucks were returned to Alexandria on Friday, even though it developed they would be needed again on Monday. When Ball learned of this, he tried to contact plaintiff at the Shreveport office but was informed that plaintiff was out. Plaintiff's secretary telephoned him at the Petroleum Club about 5:00 p. m., and plaintiff telephoned Ball from there. During the discussion, Ball asked plaintiff where he was speaking from, whereupon plaintiff replied that he was at the plant. Ball testified that he called the plant again and was again informed that plaintiff was not there. When confronted by Ball on Monday, plaintiff admitted he falsified with reference to his whereabouts.
Defendants contend that plaintiff's misrepresentation as to his whereabouts constituted "dishonesty" within the meaning of the agreement. There is no explanation in the agreement as to what was intended by the parties to constitute "dishonesty." In the absence of any assigned meaning, we think that a common-sense approach must be used to determine whether plaintiff's falsifying to his superior on only one occasion, and concerning an immaterial matter, is enough to constitute "dishonesty." This misrepresentation occurred while plaintiff was talking by long-distance telephone from a public place. Plaintiff knew that Ball was upset with him about the trucks and was aware that at that time he could do nothing to return the trucks to Shreveport. He testified that he saw no reason to further anger Ball by admitting that he was in the Petroleum Club instead of his office, thus giving Ball reason to extend an already embarrassing telephone conversation. He wished to end the conversation before more unpleasant company business could be aired in a public place.
The propriety of plaintiff's misrepresentation is not, to us, a matter of great importance or concern. We do not think that under the circumstances related above this one act of misrepresentation about an immaterial matter can reasonably be said to have been an act which constitutes "dishonesty" within the meaning intended by the parties.
Defendants cite definitions of "dishonesty" from Black's Law Dictionary and the Random House Dictionary of the English *622 Language, and both of these give as a meaning the "disposition to lie." (Emphasis supplied.) "Disposition" is defined in the Random House Dictionary as "the predominant or prevailing tendency of one's spirits." Thus, it is apparent that the solitary instance relied upon in the instant case does not constitute "dishonesty."
To further support their contention that plaintiff was terminated for causes which would disqualify him for termination pay, defendants offered testimony to show that, while the Shreveport operation had shown a profit during the time plaintiff was general manager, profit projections had not been attained in recent months. Testimony also attributed the profits made under plaintiff's management to the ending of heavy depreciation deductions on certain equipment at the Shreveport operation. These depreciation deductions had been so great that the realization of a profit was practically impossible during the years prior to plaintiff's becoming general manager.
There was also evidence that plaintiff had spent a great deal of time at the Petroleum Club during normal business hours, and that plaintiff was not diligent in his supervision of the plant, particularly the production phase of the operation. Defendant provided its officials and managers with memberships in various clubs and organizations to afford them an opportunity to meet leaders in the business community in behalf of its own interests. In this connection, plaintiff offered testimony that before he became general manager the Shreveport operation was losing money almost every year. After he became general manager, the operation made a profit, usually increased each year. Competitors testified that plaintiff enjoyed a good reputation in the business, and that plaintiff appeared to be doing a good job as general manager.
A careful review of all the evidence convinces us that, while plaintiff's superiors may not have been entirely satisfied with his performance, plaintiff was not guilty of willful negligence in the performance of his duty or of any activity which brought discredit to the company or caused the company substantial harm. Thus, he was not terminated for any reasons which would disqualify him from receiving termination pay.
Defendants claim that the trial court erred by allowing plaintiff $420.00 as wages due for the period of February 1 through February 9, 1970. Defendants assert that plaintiff was terminated as of January 31, 1970. Ball testified that on Monday, January 26, 1970, he told plaintiff that he had no choice but to ask for plaintiff's resignation by the end of the week, which would have been January 31, 1970. He offered plaintiff the opportunity to resign rather than to be terminated and told him that he would give him a letter of recommendation and two months' termination pay if he resigned. Plaintiff did not then, or any subsequent time, submit a letter of resignation. On January 26th, plaintiff cleared out all his personal belongings from the office and by January 28th had turned in all his office keys. He did not return to the office after January 28th or 29th. Ball had a telephone conversation with plaintiff on February 2d and asked plaintiff why he had not received a letter of resignation. On February 9, 1970, plaintiff received a letter dated February 6, 1970, from Ball which informed him that he was terminated effective January 31, 1970. Plaintiff's successor was appointed effective February 1, 1970.
In Dunbar v. Orleans Metal Bed Co., 145 La. 779, 82 So. 889 (1919), it was held that any form of words, whether oral or written, which conveyed to the employee the idea that his services were no longer required and would not be accepted constituted a discharge.
We think that the only meaning which plaintiff could have attached to the things *623 Ball told him on January 26th was that he was terminated effective January 31, 1970. Ball's offering him a face-saving opportunity to resign did not alter the fact that he was being terminated on January 31st. We conclude that the trial court was in error in allowing plaintiff $420.00 as wages due for the period of February 1 through February 9, 1970.
Plaintiff asserts that he should have been awarded penalties and attorney's fees under LSA-R.S. 23:632 and that the trial court erred in denying these.
The law is clear that LSA-R.S. 23:632, being coercive and penal, must be strictly construed and must yield to equitable defenses. Stell v. Caylor, 223 So.2d 423 (La.App., 3d Cir. 1969), writ refused, 254 La. 778, 226 So.2d 770.
Where there was a dispute as to wages due, the employer was not subject to penalties when he refused to pay the disputed wages. Clevy v. O'Meara, Wilson v. O'Meara, 236 La. 640, 108 So.2d 538 (1959).
In the instant case, a dispute existed as to whether defendant owed plaintiff any termination pay or wages for the period of February 1 through February 9, 1970. We find the defendant acted reasonably in not paying plaintiff the disputed sums, and agree with the trial court that defendant is not to be subjected to penalties and attorney's fees.
For the reasons assigned above, the judgment of the trial court is amended by rejecting the award of $420.00 to plaintiff as wages due for the period of February 1 through February 9, 1970, and, as amended, is affirmed.
Plaintiff-appellee is assessed with the cost of the appeal.
Amended and affirmed.