FOURNET, Justice.
 

 Mrs. Esther Beadle Olivier, in her capacity as tutrix of her five minor children born of her marriage to the late David J. Olivier, instituted this suit on their behalf as the heirs of their father to set aside a deed by notarial act dated June 1, 1942, wherein the paternal grandmother of the minors, now deceased, conveyed to her only surviving son, Berwick J. Olivier, her right, title, and interest in and to a tract of land with improvements -thereon located in the town of Houma, Louisiana, on the ground that the sale was a simulation or donation in disguise. She also seeks to have the property, after the annulment of the sale, decreed to form part of the estate of Mrs. Eva Edwards Olivier. This appeal is being prosecuted from the judgment of the lower court dismissing the suit.
 

 It appears from the record that the property in controversy was acquired on July 5, 1897, by Charles Olivier while he was married to Eva Edwards and that her half interest in this community property and the usufruct of her husband’s half was all that she had at the time of his death in 1916. Thereafter, for her support and maintenance, she relied exclusively on the cash contribution of $10 monthly from each of her three sons, David, George, and Ber-wick Olivier, and the produce and rentals realized from the property. This arrangement continued until the death of George in 1936, when her contribution in this respect was reduced to the $20 received from the two remaining sons and such extra amounts as she requested from them from time to time. About a month after David’s death in April of 1942, Mrs. Eva Edwards Olivier, in company with the defendant, appeared before a notary public and executed the deed in controversy. In this deed Mrs. Olivier conveyed to her son her “right, title, and interest” in the property for the recited consideration of $2,170, $1,170 of which was in cash and the remainder of which was represented by a note made to the order of the maker (Berwick) and endorsed by him in blank. This note was'due and payable in three months, subject, however, to a stipulation that it could be periodically and successively extended by the payment-of $75 on or before maturity. In this deed Mrs. Olivier reserved unto herself the usufruct . of the property and she continued to remain in possession thereof until her de.ath. on June 3, 1943, collecting the-rent from-such apartments as "she had leased,-'amounting-to
 
 *415
 
 approximately $27 a month. From the date of the execution of this sale, the defendant testified he contributed no further amounts toward her support.
 

 The plaintiffs are attacking this deed as a simulation and donation in disguise. They, as the children and heirs of their late father, David Olivier, are, together with the defendant, Berwick Olivier, the sole heirs of both Mr. and Mrs. Charles Olivier, since George died without issue in 1936.
 

 Under the express provisions of the Revised Civil Code, “The sales of immovable property made by parents to their children, may be attacked by the forced heirs, as containing a donation in disguise, if the latter can prove that no price has been paid, or that the price was below one-fourth of the real value of the immovable sold, at the time of the sale” (Article 2444), but “where the thing sold remains in the possession of the seller, because he has reserved to himself the usufruct, or retains possession by a precarious title, there is reason to presume that the sale is simulated, and with respect to third persons, the parties must produce proof'that they are acting in good faith, and establish the reality of the sale.” Article 2480.
 

 The notary before whom the act was executed testified that the cash consideration therein recited was not passed in his presence when the act was signed and the defendant, admitting this fact but seeking to rebut the presumption provided for in Article 2480, testified he paid this amount to his mother in cash later that same afternoon in his grocery store. In corroboration he offered the testimony of his wife and of one Alvin J. Colwart. The defendant also testified he made regular cash payments to his mother thereafter aggregating the sum of $775, all during the short time that intervened between the date of the deed and her death, and all in accordance with the notations made on the back of the note by the defendant himself.
 

 The defendant, professing to have no knowledge of his mother’s disposition of this money and obviously realizing the significance of the fact that the evidence failed to reveal any trace thereof, sought to bolster his cause by stating his mother lived extravagantly and beyond her means, purchasing expensive fruits out of season, keeping a supply of expensive canned goods and fruits on hand, maintaining 6 cats and 5 dogs on sausage and meats, and making ■lavish donations of this money to his wife and their son, who was in the service. However, the evidence to support this, like the evidence in support of the main issue, when carefully studied and analyzed is, to say the least, most unimpressive.
 

 The defendant’s explanation that the reason motivating the sale and his acquisition óf the property was a desire to protect his mother’s possession of the property since his sister-in-law was pressing her for a settlement of the interest of the minors therein, is denied by the sister-in-law who
 
 *417
 
 also testified that he did attempt to purchase the interest of the minors in the property but that she refused to consent to such a sale, a fact which he admits. His explanation further loses its force in face of the fact that he had advice of counsel and admitted he knew his mother could not be deprived of her usufruct of this community property during her lifetime, although it does not appear he so advised her. In fact, we learn from the notary, who is also an attorney and is now a district judge, that when the defendant’s mother appeared with her son for the execution of the deed she wished to be assured that by signing the same she would not be disturbed in her possession and her continued use of the rentals from the property during her lifetime.
 

 Another weakness in the defendant’s evidence is apparent in his statement that within 30 days after he supposedly gave this large sum of money in cash to his 73-year-old mother — which, according to his story, he allowed her to carry away in her purse and take to her home where, except for tenants, she lived alone, without being concerned for her safety in keeping such a large sum around the house or without caring what disposition she made thereof— he made the first payment of $100, although the note did not mature for another 60 days, and that he continued making cash payments monthly thereafter, without concern as to her disposition thereof or without regard to her needs; further, that the notations appearing on the back of the note showing such payments were all in his own handwriting, having been made by him with “a high priced two-bits fountain pen” and with the same ink. This seems to be most incredulous in the light of the record revealing Mrs. Olivier could write and further, that she had lived a simple and frugal life, for many years, subsisting on the small allowances given her by her sons, the small rental she collected from the apartment and room she rented out, the produce from the garden she raised, the chickens and cows she kept', the cream cheese she occasionally sold, and the small revenue derived from time to time in renting a part of the premises out for trailer purposes. Out of these small amounts she not only managed to live, but, also, to put a little money in a savings account in a local bank, which account at the time of her death, showed a balance of $150. The most inexplicable scrap of the whole fabric from which the defendant’s evidence is sought to be pieced together is the failure of the deceased to put these large cash sums in her savings account, and, also, her withdrawal from such account on January 12, 1943, of the small accumulated interest of $2.24 when at that time she was supposed to have in her possession these unusually large sums of cash.
 

 The defendant’s testimony in many details that are unimportant except for the bearing they have on the credulity of his whole defense is impeached. In many in
 
 *419
 
 stances his statements are exaggerated and incredible and in others they are refuted by the evidence. To illustrate, in seeking to establish his mother’s extravagance the defendant testified she lived far beyond her means, purchasing expensive food for herself and her many pets from 5 or 6 stores in her immediate neighborhood and from a Mr. Keppel, an itinerant vendor from whom she purchased fruit, although the record shows she purchased the bulk of her groceries at the defendant’s store and that these never amounted to more than $15 monthly. However, when pressed under cross-examination, the defendant admitted the canned goods found in a cabinet in his mother’s house at the time of her death had a value of only $3 or $4. In addition, the defendant failed to offer the testimony of any of these store keepers, or of Mr. Keppel, to corroborate his statement that she purchased large quantities of expensive foods from them. Of necessity, therefore, we must assume, as we are admonished to do under the well-recognized rules of evidence, that had they been called to testify their testimony would have been adverse to ’the defendant. First National Bank of Ruston v. Jones, 186 La. 269, 172 So. 155; Bates v. Blitz, 205 La. 536, 17 So. 2d 816; Succession of Yeates, 213 La. 541, 35 So.2d 210, and the authorities therein cited. Finally, the evidence showed the deceased owned only one dog.
 

 The testimony of the defendant’s wife, is equally unimpressive :and do£s,ri}ot:-,add any weight to the defendant’s cause. While she did testify her husband paid his mother at the store with the money he kept there and that she saw her mother-in-law place the sum in her handbag, on cross-examination she admitted she could not testify of her own knowledge the exact amount that passed between them because she only heard and saw the counting as she passed by them while she was busily engaged in waiting on customers. The weight to be given this evidence is further weakened when we consider it in the light of the other evidence in the record and more particularly Mrs. Olivier’s attempt to corroborate her husband’s effort to bolster his evidence with respect to his mother’s extravagance in lavishing gifts on his wife and son, for she would have us believe, on her simple and uncorroborated statement, that following the sale of the property her mother-in-law gave her $50' in cash on two occasions and over $200 in sums ranging from $10 to $50 from time to time which she sent to her son who was in the service, and that she sent this money through the mail, unregistered and uninsured, in specie. In apparent justification for sending the.money she proffered the statement that he was always broke and in need of money and that he used the money .to purchase watches, of which he had three or four. But under cross-examination she admitted the boy had never written his grandmother. From this fact it ,may well be inferred that if Mrs. Olivief;-did indeed send,these sums to her
 
 *421
 
 son she sent her own money and the matter of the grandmother sending hers was an afterthought, or else that she did not inform her son his grandmother was his benefactor, for it would be most unusual for the boy who had so consistently written his mother for money to have been so ungrateful he would not even acknowledge his grandmother’s generosity, unless his mother failed to inform him of the source of the cash.
 

 The testimony of the defendant’s other witness, Colwart, when analyzed, is contradictory and has very little probative value. On direct examination Colwart did testify that while in the store of the defendant purchasing some articles he saw Mrs. Olivier paid the money by her son and that she put this money in her purse after it had been counted by the defendant, but on cross-examination he not only confessed he was not paying any particular attention to what was going on but admitted that while he saw the money being counted and saw it stacked in piles of $100 on the counter and made up of $10 and $20 bills, he left the store when the $1,000 mark had been reached and before the counting was completed. He also stated he did not know at the time the occasion for the delivery of this amount to Mrs. Olivier and only learned about it the next day when the defendant, driving into his filling station for gas, said it was the consideration given her for the purchase of the property.
 

 Reviewing the entire record we find it most convincing that Mrs. Olivier continued to live after the execution of this deed very much as she had before, that is, on the produce and rentals from her property and on the small amount she customarily received from the defendant, principally in the form of groceries. The record is totally barren of any evidence from which the disposition of any part of the money allegedly paid her by her son could be traced, with the exception of the fantastic story the defendant and his wife told of her extravagance.
 

 We therefore conclude that the defendant has failed to discharge the burden resting upon him to prove the reality of the sale. In fact, we think that every fact and circumstance adduced during the trial^of the case supports the conclusion that the sale was a simulation, pure and simple.
 

 For the reasons assigned, the judgment of the lower court is reversed and set aside and it is now ordered, adjudged, and decreed that the deed executed by Mrs. Eva Edwards Olivier, widow of Charles Olivier, to the defendant, Berwick J. Olivier, recorded in the conveyance records of Terre-bonne Parish in book C.B. 132, at folio 645, be declared null and void and of no effect ; it is further ordered that the property described in this said sale be decreed to form part of the estate of the said Mrs. Eva Edwards Olivier. The defendant is to pay all costs.
 

 O’NIELL, C. J., takes no part.