108 So.2d 538

Ralph CLEVY

v.

Robert W. O'MEARA.

Gary WILSON

v.

Robert W. O'MEARA.

No. 43536.

Jan. 12, 1959.

Rehearing Denied Feb. 16, 1959.

———◆———

Reed, Reed & Reed, Floyd J., Reed, New Orleans, for plaintiffs-appellants

Richard Mathews, New Orleans, for defendant-appellee.

HAMITER, Justice.

In the petitions of the above captioned suits the respective plaintiffs demanded wages for twelve hours' work allegedly performed for the defendant on February 29, 1956. Additionally, they asked for penalties and attorneys' fees under the provisions of LRS 23:631 and 632.

The trial court awarded $13.33 to Clevy and $12.68 to Wilson on the basis of six and one-half hours' work by each during the day in question, but it rejected their demands for penalties and attorneys' fees.

Plaintiffs appealed, and the defendant answered the appeals praying that the judgments be amended by entirely rejecting the demands of plaintiffs.

Except that Clevy claims a base pay of $2.05 per hour and Wilson one of $1.95 per hour, the facts and issues of the two causes are identical. For this reason the suits were tried together, and in this court the appeals have been consolidated and docketed under a single number.

The record discloses that plaintiffs were employed during the month of February, 1956 as roughnecks on an oil drilling rig operated by the defendant. The employment arrangement called for their working in stretches of ten days each, at twelve hours per day, between which there would be off periods of five days. During such stretches they lived on a quarter boat located a few blocks from the rig.

About six-thirty or seven o'clock p. m. of February 29, 1956, while at the rig, the plaintiffs and two other crew members decided to quit their employment. Later, on returning to the quarter boat, they asked

for their time report from one Thibodaux who was in charge of drilling operations at the time. He was unable to comply with the request because the records were then at the rig. However, he agreed to telephone plaintiffs' wage time to defendant's New Orleans office, and he stated that the checks should be available there on Friday, March 2.

When plaintiffs arrived at defendant's New Orleans office on the latter date they were informed by the lady bookkeeper that their checks had been made out for work performed through February 28, but that there was no one present authorized to sign them. She stated, however, that if they would call back the following day the checks would probably be ready.

Plaintiffs did not return on Saturday as the bookkeeper had suggested. Instead they consulted the law firm of Reed, Reed & Reed; and on that day Mr. Floyd J. Reed addressed a letter to the defendant (at his home) in which demand was made for plaintiffs' wages, including those for February 29.

The mentioned demand was received "Special Delivery" by the defendant on Sunday (March 4). On the following day (March 5), in response thereto, he sent a telegram to plaintiffs' attorneys informing them that the pay checks had been ready since March 3. The telegram also recited the amounts of the checks which indicated that they did not include pay for February 29.

On March 7 these checks were obtained and receipted for at defendant's office by Mr. Floyd J. Reed, at which time his attention was directed to the fact that they were in payment of plaintiffs' wages only through February 28. Nevertheless, in accepting the checks, Mr. Reed made no objection that payment for February 29 was not included; nor did he insert in his written receipt any reservation of rights regarding the wage claim for that day. Later during March 7, however, he wrote to the defendant and claimed for his clients wages from February 29 to March 6, both dates inclusive.

The defendant refused to pay the claims and on March 23, 1956 plaintiffs instituted the instant suits, they invoking the penal provisions of LRS 23:631 and 632 and demanding payment of regular wages running continuously from (and including) February 29, 1956 until finally paid, together with attorneys' fees.

On several occasions ths court has considered the mentioned statute and has held that the language thereof "is not so peremptory as to forbid an equitable defense against the penalty" (Deardorf v. Hunter, 160 La. 213, 106 So. 831, 832); that the statute "should be strictly construed" (Hazel v. Robinson & Young, 187 La. 51, 174 So. 105, 106); and that "it may yield to equitable defenses" (Bannon v. Techeland

Oil Corporation, 205 La. 689, 17 So.2d 921, 922). See also Elliott v. General Gas Corporation, 229 La. 128, 85 So.2d 55, wherein the doctrine of the cited cases is affirmed as the jurisprudence of this court.

Unquestionably, under the facts above shown, a dispute existed between these plaintiffs and the defendant ·as to whether the former were entitled to wages for February 29. And in view of plaintiffs' accepting the above mentioned checks and retaining the proceeds thereof, knowing at the time that the payments were for amounts less than those demanded, it might well be seriously contended that the doctrine of accord and satisfaction is applicable here and, hence, prevents a claiming of any additional wages with penalties and attorneys' fees. See Jefferson & Plaquemines Drainage District v. City of New Orleans, 236 La. ——, 107 So.2d 663, together with the cases cited therein.

■ But be that as it may, we have concluded that because of the equitable considerations hereinafter discussed plaintiffs are not entitled to the penalties and attorneys' fees demanded.

In the first place undoubtedly the defendant acted in good faith in refusing to pay plaintiffs any wages for February 29. In so refusing he relied on the records of one ˙ S. M. Bracey, the driller under whose control these plaintiffs principally worked, prepared during the course of the drilling oper-

ations. On Bracey's drilling report for February 29 plaintiffs' names were scratched out, this indicating that they performed no work that day. And corroborative thereof is the testimony given by Homer Hicks and Edward Thibodaux, defendant's top supervisory personnel in the field, which was to the effect that when visiting the rig at intervals during the day in question they noticed that plaintiffs were not working—they were merely sitting or lying around.

To contradict such evidence, including the mentioned report of Bracey, only the plaintiffs testified. And we find their testimony to be weak, not particularly convincing, and conflicting in several noteworthy respects.

Again, it is to be noticed that plaintiffs at all times—even in their petitions of the instant suits—have demanded payment for a full day's work of twelve hours on February 29; yet when testifying they admitted having worked only about one-half day on that date. Thus, Clevy stated: " * * * we only worked six hours that day". And Wilson said: "We relieved a crew at twelve o'clock and worked until six-thirty * * *."

■ The above circumstances taken together constitute, in our opinion, an equitable and a sufficient defense to plaintiffs' demands for penalties and attorneys' fees. Hence, we are unable to disturb the rulings which disallowed those claims. Nor will we annul, as defendant requests in answering the appeals, the trial judge's awards of

wages for six and one-half hours on February 29, 1956. Since he saw and heard the witnesses his finding respecting this item is entitled to great weight.

For the reasons assigned the judgments appealed from are affirmed. Plaintiffs shall pay the costs of these appeals.

FOURNET, C. J., concurs in the decree.

PONDER, J., dissents.

TATE, J., dissents and assigns written reasons.

TATE, Justice (dissenting).

I respectfully dissent. This is the first instance in which an employer has been excused from the mandatory legislative penalties for non-payment of wages when the wages admittedly due *were never tendered* and the employer's liability for which would have been readily ascertained by reasonable investigation. Further, the majority appears to have overlooked certain uncontradicted testimony in the record which discloses that the employer, far from being entitled to any equitable defense, was not in good faith in resisting this claim for wages due for February 29, 1956.

No less than the majority would I regret assessing substantial penalties for the non-payment of relatively insignificant amounts of unpaid wages. But the legislature has mandatorily provided that "It *shall* be the duty of every person, employing laborers * * *, within twenty-four hours after such discharge or resignation [of any employee], to pay the laborer or employee the amount due under the terms of employment * * *", LSA–R.S. 23:631. The legislature has further provided, LSA–R.S. 23:632:

"Any employer who fails or refuses to comply with the provisions of R.S. 23:631 *shall be liable* to the laborer or other employee for his full wages from the time the demand for payment by the discharged or resigned laborer or employee was made, until the employer shall pay or tender payment of the amount due to such laborer or other employee. *Reasonable attorneys' fees shall be allowed the laborer* or employee by the court which shall be taxed as costs to be paid by the employer, in the event *a just suit be* filed by the laborer or employee after twenty-four hours shall have elapsed from time of making the first demand following discharge or resignation." (Italics mine)

This remedy is harsh; but it is for the legislature (which had enacted this statute to end "an evil practice then prevailing among some employers of forcing a discharged laborer to wait until pay day, or longer, to receive the wages he had earned," Elliott v. General Gas Corp., 229

La. 128, 85 So.2d 55, 57) and not the courts to mitigate the harshness of this penalty for non-payment of wages when found without contradiction to be due.

It is true that the courts have held that the penal provisions of the statute should be strictly construed and that an employer may interpose an equitable defense to the imposition of statutory penalties *for a reasonable delay* in the tender or payment of wages found to be due. Elliott v. General Gas Corp., 229 La. 128, 85 So.2d 55; Strickland v. American Pitch Pine Export Co., 224 La. 949, 71 So.2d 338; Bannon v. Techeland Oil Corp., 205 La. 689, 17 So. 2d 921. But never until the present instance has it been held that a perhaps initially good faith dispute over the amount of wages due justifies the employer *indefinitely* to withhold investigation to determine whether the wages are due and *indefinitely* to avoid tender thereof.

It is necessary to advert to the facts briefly.

The plaintiffs-employees testified clearly and unequivocally, and without contradiction by any first-hand eyewitness, that they worked for the 6½ hours on February 29th. The trial court accepted this testimony and awarded their wages for this time worked, which award the majority herein affirms.

It is essentially uncontradicted that the only one of defendant's supervisory employees with first-hand knowledge about whether or not these plaintiffs worked on February 29th is S. M. Bracey, the driller in direct charge of their drilling crew. *But defendant did not see fit to produce the testimony of this essential witness nor to explain his failure to do so.* Indeed, so far as the record reveals, Bracey may still be in defendant's employ! [1]

The drilling report for February 29th, however—completed in Bracey's handwriting (Tr–128)—is found in evidence. The majority, in noting that the plaintiffs' names are found on the list as printed in Bracey's handwriting, also noted that "plaintiffs' names were scratched out, this indicating they performed no work that day." The majority overlooks, however, that these names printed by Bracey were *not* scratched out *by Bracey* (the only witness with first hand knowledge) but *admittedly* by *Thibodaux* (Tr–154), the drill-

[1]. The only testimony in the record as to the present whereabouts of Bracey is found in the testimony of tool pusher Hicks at Tr–136 as follows:

"Q. Wasn't Mr. Bracey the driller—did not Mr. Bracey, the driller, also resign from employment?
"A. No, he did not.

"Objection by Mr. Reed:
"I object to this leading.
"By Mr. Mathews:
"Q. Sir?
"A. He did not.
"Q. To your knowledge is Mr. Bracey presently employed by O'Meara?
"A. To my knowledge, I would not know."

ing superintendent, a higher supervisory employee with no direct knowledge as to whether or not the men had worked on that date. This drilling report by Bracey further indicates that the present plaintiffs did not resign until after at least six hours of work on that date [2]. Defendant must be charged with notice of the contents of this report as it is admitted that this drilling report was received by defendant's New Orleans office at least by March 5th, 1956; particularly when by reiterated demands defendant was aware that plaintiffs claimed to have worked on February 29th.

The trial court properly discounted as of little probative force the testimony of Hicks and Thibodaux, defendant's top supervisory employees, who testified that they occasionally visited the rig on February 29th and saw plaintiffs sitting around. Under cross-examination, these witnesses admitted that they did not know of their own knowledge whether or not the employees were on duty at the time they saw them (it must be remembered that much of the work at a drilling rig does not require the entire efforts of the whole crew). Thibodaux further admitted he knew that members of the plaintiffs' drilling crew, possibly including plaintiffs (as the latter

positively testified), had made a trip during the work-day to another rig in the performance of their duties to get some cable. These supervisors further admitted that Bracey was the only man with personal knowledge of whether the men had worked on the date in question; and ultimately admitted that the sole basis of their own belief that the men had not worked was what the non-testifying *Bracey* had allegedly told them.

Had Bracey corroborated such testimony, or even had his absence been explained, such testimony more impressively might have justified a good faith defense based thereupon. But to permit defendant to base his defense upon such hearsay testimony places him in a better position than if he had produced Bracey at the trial and subjected him to plaintiffs' cross-examination.

Thus the record presented to us shows no contradiction whatsoever to plaintiffs' testimony that they had worked for half of their tour on February 29th. Their testimony is indeed somewhat corroborated by defendant's own office records. Additionally, however, defendant's unexplained failure to call Bracey, its only supervisory employee possessing peculiar and first-hand knowledge as to allegations of his defense,

2. By reference to D-9, the "Daily Drilling Report" which was entirely made out in Bracey's hand-printing, the remarks "as to work performed show:
    "Three hours drilling

"one hour Tacking Survey
"two hours working on swerval (*sic*) and breakout cat head;
"six hours cirl (*sic*) three of crew refused to make trip."

creates the presumption that Bracey's testimony would have been adverse to defendant; that is, that Bracey also would have corroborated plaintiffs' own testimony that they had worked on the day in question. Walters v. Coen, 228 La. 931, 84 So. 2d 464; Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582; Olivier's Minor Children v. Olivier, 215 La. 412, 40 So.2d 803; Succession of Yeates, 213 La. 541, 35 So.2d 210; Bates v. Blitz, 205 La. 536, 17 So.2d 816; Perez v. Meraux, 201 La. 498, 9 So. 2d 662.

In determining whether defendant was in good faith in believing that the plaintiffs had not worked at all on February 29th, the unexplained failure of defendant to call Bracey has an additional implication. The reason for the adverse presumption, of course, is that it is assumed that a party who fails to call a witness with peculiar and concrete knowledge of a defense, does so because he knows the witness will furnish adverse information. In the present case, for instance, we can be sure that if Bracey's testimony would have supported defendant's defense that the plaintiffs had not worked at all on February 29th, then defendant's able and astute counsel would have produced Bracey's testimony if at all possible.

The unmistakable inference of defendant's unexplained failure to produce Bracey's testimony is that defendant *knew* that Bracey would testify that the plain-

tiffs had as they claimed worked on February 29th; and *if defendant knew that Bracey* (its only supervisor with first-hand knowledge) *would so testify,* then defendant cannot be said to have been in good faith in resisting the claim of plaintiffs for their unpaid wages.

The argument that any unfavorable consequences attend upon the circumstance that plaintiffs' attorney on March 7th picked up plaintiffs' checks for wages through February 28th from defendant's office manager and receipted without protest (but also without discussion) for them, completely overlooks the uncontradicted testimony of this attorney (Mr. Reed) that he did so only upon the specific previous understanding by telephone conversation with defendant's then attorney (Mr. Cain) that the two attorneys would subsequently discuss the claim for additional wages due for work performed on February 29th. (Credit for these hours had been deleted by the defendant's drilling superintendent, Thibodaux, after the two plaintiffs and two others of the six crew members had suddenly quit in the middle of shift because of a lack of confidence in the new driller, Bracey, who commenced his first day's work in that capacity on February 29th. Thibodaux and the plaintiffs had, following this, had a severe disagreement at the drilling rig.) Again, defendant did not see fit to call Mr. Cain to contradict this testimony, which must be accepted as cor-

rect. Thus this incident, rather than indicating any waiver by plaintiffs of their right to wages for February 29th, to the contrary indicates the defendant's knowledge of plaintiffs' claim for such wages and its complete failure to institute a timely investigation to discover whether or not it was liable, despite its agreement to do so.

Because of this initial dispute, the able and learned trial court disallowed penalties, relying upon Deardorf v. Hunter, 160 La. 213, 106 So. 831, Oller v. Bender, La. App. 2 Cir., 146 So. 780, 781, see also Elliott v. General Gas Corp., 229 La. 128, 85 So.2d 55. In each of these cases employees were not paid wages because of clerical error or malfeasance on the part of supervisory employees. But in disallowing penalties, the opinion in each case specifically relied upon the *prompt* investigation of wage liability after demand by the employee and the *prompt* tender by the employer of the deficient wages ultimately found to be due the employee. In the present case, however, the employer (so far as the record shows) failed ever to find out from the only supervisor with first-hand knowledge whether or not the plaintiffs had indeed worked on February 29th, and even failed to produce this witness at the trial.

It should be reiterated that the courts have allowed an *equitable* defense to penalties for non-payment of wages due resigned employees. But he who seeks equitable relief must himself be free from any unlawful or inequitable conduct with respect to the matter, which rule is sometimes stated as "He who comes into a court of equity must come with clean hands." City of New Orleans v. Levy, 233 La. 844, 98 So.2d 210, 218; Pearlstine v. Mattes, 223 La. 1032, 67 So.2d 582; cf., Rhodes v. Miller, 189 La. 288, 179 So. 430.

I think illustrative of defendant's evasive attitude toward the prompt payment of wages in accordance with the legislative mandate is the method by which it handled the payment of wages due through February 28th in the amount of $195.62 (Clevy) and $195.80 (Wilson), as to which there was no dispute as to liability. These wages were due within 24 hours after the resignation of February 29th, but by mutual agreement payment thereof was deferred until Friday, March 2nd, when plaintiffs were to report at defendant's New Orleans office.

When plaintiffs did so, no checks were ready for them, and there was no one in the office with authority to sign them. These workmen, from out of town, were forced to pawn a wristwatch and to borrow money in order to subsist for the night.

The checks were not actually signed or ready for them until the late afternoon of March 5th, and then only after their attorney had made formal demand on March 4th for payment thereof. The further cir-

cumstance that tender of their wages by telegram at 4:00 P.M. on March 5th, falsely stated that the checks had been signed and available for plaintiffs on Saturday, March 3rd (although testimony produced at the trial from defendant's office manager indicated that such checks had not actually been signed until Monday, March 5th), is relevant because it indicates a conscious attempt to evade the penalties due following demand of March 2nd for non-payment of the wages admittedly due through February 28th.

Were plaintiffs not entitled to penalties for non-payment of wages due for February 29th, it seems to me quite probable that they would have been entitled to penalties for non-payment of wages due through February 28th (as to liability for which wages there is no dispute) from March 2nd (when defendant had agreed to pay them, which was more than 24 hours after the employees' resignation) until such wages were tendered on March 5th. An employer is charged with notice of the mandatory statutory requirement that his resigned employees be paid within 24 hours, and I cannot conceive that (in the absence of extraordinary circumstances) it would be an equitable excuse for non-timely payment to say that no one with check-sign-ing authority had come around the employer's office for five days.[3]

Parenthetically, one may well question whether it is reasonable to suppose that an employer would risk, unless in good faith, the imposition of penalties by the failure to pay relatively slight amounts of wages claimed. It must be confessed that this is a troubling question. But if reasonable attitudes always prevailed in human affairs, fairly little litigation would result; and such doubts, while natural, do not supply the place of proof that the employer was in good faith in resisting payment of wages claimed, when his own records and uncontradicted testimony indicate that such wages were indeed owed the plaintiffs-employees. Indeed, there is much in the evidence to support plaintiffs' allegations that the refusal to pay these undoubtedly owed wages resulted from a continued dispute manufactured by the employer solely to avoid the penalties due when the plaintiffs-employees filed suit after the employer had, following reiterated demands, negligently permitted a fair amount of penalties to accrue before undertaking any investigation of its liability for the claimed wages.

For the foregoing reasons, I respectfully dissent from the majority opinion of my esteemed brethren.

---

3. It should also be noted that, although the employees have filed a just suit for unpaid wages, we have not allowed them reasonable attorneys fees although LSA– R.S. 23:632 provides that such "shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer."