# STATE OF LOUISIANA
## COURT OF APPEAL, THIRD CIRCUIT

## 13-1241


**ROBERT PORBECK**

**VERSUS**

**INDUSTRIAL CHEMICALS (US) LIMITED, ET AL.**


**\*\*\*\*\*\*\*\*\*\***

APPEAL FROM THE
NINTH JUDICIAL DISTRICT COURT
PARISH OF RAPIDES, NO. 244,514
HONORABLE MARY LAUVE DOGGETT, DISTRICT JUDGE

**\*\*\*\*\*\*\*\*\*\***

**JIMMIE C. PETERS**
**JUDGE**

**\*\*\*\*\*\*\*\*\*\***

Court composed of Jimmie C. Peters, Billy Howard Ezell, and Shannon J. Gremillion, Judges.


**AFFIRMED IN PART;**
**REVERSED IN PART; AND RENDERED.**

**Carlton Jones, III**
**Roedel, Parsons, Koch, Blache, Balhoff, & McCollister**
**8440 Jefferson Highway, Suite 301**
**Baton Rouge, LA 70809-7652**
**(225) 929-7033**
**COUNSEL FOR DEFENDANT/APPELLANT:**
    **Industrial Chemicals (US) Limited**

**Carmack M. Blackmon**
**Carmack Blackmon and Associates**
**P. O. Box 44035**
**Baton Rouge, LA 70804-4035**
**(225) 388-9872**
**COUNSEL FOR DEFENDANT/APPELLANT:**
      **Industrial Chemicals (US) Limited**

**Paul J. Tellarico**
**Tellarico Law Firm**
**P. O. Box 12967**
**Alexandria, LA 71315**
**(318) 787-6603**
**COUNSEL FOR PLAINTIFF/APPELLEE:**
      **Robert Porbeck**

**PETERS, J.**

The defendant, Industrial Chemicals (US) Limited, appeals a trial court judgment awarding the plaintiff, Robert Porbeck, damages, penalties, and attorney fees based on the terms of an employment contract entered into by the parties. For the following reasons, we affirm the trial court's award of severance pay and insurance benefits to Mr. Porbeck, but reverse the award of penalties and attorney fees and render judgment.

## DISCUSSION OF THE RECORD

This matter stems from an employment relationship between Mr. Porbeck and Industrial Chemicals (US) Limited (ICL), which is a subsidiary of Industrial Chemicals Group Limited, a United Kingdom company. Mr. Porbeck began working for ICL as a processing engineering manager at ICL's Lecompte, Louisiana facility on February 22, 2007, and ICL terminated his employment on October 31, 2011. The issue in this litigation involves the severance benefits, if any, owed to Mr. Porbeck.

With regard to the underlying facts in this litigation, the evidentiary record establishes that in the summer of 2006, Mr. Porbeck, who is a mechanical engineer, began performing consulting services for ICL in its production of aluminum chemicals. Initially, he devoted sixteen hours per week to his consulting activities. Approximately five months later, Renea Ducote, ICL's Lecompte plant manager, approached him concerning increasing his hours. As a result of the negotiations that followed, Mr. Porbeck quit his job with AFCO Steel and began working for ICL. It is undisputed that the terms of the employment contract entered into included a monthly salary to Mr. Porbeck of $8,500.00 ($102,000.00 annual salary); medical benefits for him and his wife; a customized work schedule which

allowed him to alternate weekly between the Lecompte plant and his Little Rock, Arkansas home; four weeks annual vacation; and travel and lodging expenses. Mr. Porbeck claims in this litigation that the contract also included a severance package comprised of eight months' salary and eight months' health insurance. ICL denies that the employment contract provided any severance benefits.

After ICL terminated his employment on October 31, 2011, Mr. Porbeck requested that ICL pay the severance benefits. ICL responded by continuing Mr. Porbeck's medical benefits, but refused to continue paying his salary. When negotiation through email correspondence with various members of the ICL administration did not resolve the issue, Mr. Porbeck retained counsel who made demand on ICL, again without success.

On May 1, 2011, Mr. Porbeck filed suit against both ICL and Ms. Ducote,[1] alleging breach of contract and seeking damages equal to his claims under the severance package in the employment contract, as well as statutory penalties and attorney fees. The matter went to trial on February 5, 2013, and, following the close of evidence, the trial court orally ruled that a lawful, enforceable employment contract existed between Mr. Porbeck and ICL and that the contract included the severance package asserted by Mr. Porbeck. Having reached this factual conclusion, the trial court rendered judgment awarding Mr. Porbeck damages in the amount of $68,000.00 (the equivalent of salary for eight months) and $4,255.00 (the cost of health insurance for eight months).

At the completion of the evidence, the trial court took the penalties and attorney fee issues under advisement. In written reasons filed on May 9, 2013, the trial court concluded that the payment due under the severance package constituted

_____

[1] Mr. Porbeck voluntarily dismissed Ms. Ducote as a defendant at trial.

2

wages pursuant to La.R.S. 23:631 and awarded Mr. Porbeck an additional $25,500.00 in statutory penalties and $7,500.00 in statutory attorney fees. On May 17, 2013, the trial court executed a judgment consistent with its factual findings and awards.

ICL perfected this appeal and raises five assignments of error:

1. The trial court erred by holding that the plaintiff had a valid and enforceable employment contract with ICL despite that his employment was "at-will" and without a fixed term.

2. The trial court erred by holding that the plaintiff was entitled to severance pay and health insurance benefits after the termination of his "at will" [sic] employment.

3. The trial court erred by holding that severance pay and health insurance benefits are "wages" pursuant to La. R.S. 23:631 and 632.

4. The trial court erred by holding that the plaintiff is entitled to penalties and attorney's fees for his claims for severance pay and health insurance benefits despite the lack of affirmative pleading for those special damages and the lack of specific legal or contractual authority therefor.

5. The trial court erred by admitting the purported February 22, 2007 email (Trial Exhibit 8) into evidence despite plaintiff's failure to demonstrate authenticity.

## OPINION

"A contract is an agreement by two or more parties whereby obligations are created, modified, or extinguished." La.Civ.Code art. 1906. It is formed by the consent of the parties, via offer and acceptance. La.Civ.Code art. 1927.

> Unless the law prescribes a certain formality for the intended contract, offer and acceptance may be made orally, in writing, or by action or inaction that under the circumstances is clearly indicative of consent." Unless otherwise specified in the offer, there need not be conformity between the manner in which the offer is made and the manner in which the acceptance is made.

*Id.*

3

A contract is interpreted by determining the common intent of the parties. La.Civ.Code art. 2045. It further has the force of law between the parties for claims arising from the contract. La.Civ.Code art. 1983. A trial court's factual findings with regard to the intent of the parties is reviewed on appeal pursuant to the manifest error—clearly wrong standard of review. *See Rosell v. ESCO*, 549 So.2d 840 (La.1989).

"The employer-employee relationship is a contractual relationship. As such, an employer and employee may negotiate the terms of an employment contract and agree to any terms not prohibited by law or public policy." *Newsom v. Global Data Systems, Inc.*, 12-412, p. 4 (La.App. 3 Cir. 12/12/12), 107 So.3d 781, 785, *writ denied*, 13-429 (La. 4/5/13), 110 So.3d 595. A breach of a contract occurs when a party fails to perform in accordance with the contract terms, which failure results in damages to the other party. *Favrot v. Favrot*, 10-986 (La.App. 4 Cir. 2/9/11), 68 So.3d 1099, *writ denied*, 11-636 (La. 5/6/11), 62 So.3d 127. The party seeking the performance of an obligation bears the burden of proving the existence of the obligation by a preponderance of the evidence. La.Civ.Code art. 1831; *Natali v. Froeba*, 98-1354 (La.App. 3 Cir. 3/3/99), 735 So.2d 30, *writ denied*, 99-1442 (La. 9/17/99), 747 So.2d 1106.

*Analysis of the Employment Contract*

In its first two assignments of error, ICL argues that the trial court erred in finding that a valid, enforceable employment contract existed between it and Mr. Porbeck. Alternatively, ICL asserts that even if the evidence establishes a meeting of the minds on the terms of employment in general and the severance package in particular, any contract formed from that agreement is invalid because Mr. Porbeck

was an at-will employee and, as such, he was not entitled to severance pay and continuing health insurance benefits. We find no merit in these arguments.

In response to Ms. Ducote's 2006 suggestion that he increase his work time with ICL, Mr. Porbeck submitted a new proposal, via email, in which he offered to quit his current job with AFCO Steel, join his brother's Little Rock, Arkansas engineering firm, and then enter into a one-year consulting contract with ICL which would commit him to a work schedule of thirty-two hours per week. According to Mr. Porbeck, he emailed a more detailed proposal based on this plan to Ms. Ducote on December 20, 2006; and on January 5, 2007, he emailed her a Contract Services Proposal based on his discussions with her in regards to the previous two proposals.

Mr. Porbeck testified that further discussions with Ms. Ducote resulted in him submitting a new proposal. In accordance with Ms. Ducote's suggestions, this new proposal outlined two employment options: "Option A" which reiterated the proposal that had him quitting his current position, joining his brother's firm, and then contracting with ICL through his brother's firm; and "Option B," which called for him to be hired full time by ICL. Option B, according to Mr. Porbeck, contained the following employment conditions: $8,500.00 monthly/$102,000.00 annual salary; a weekly, alternating work schedule, with one week at ICL's plant and one week at Mr. Porbeck's home in Little Rock, Arkansas; medical benefits for Mr. Porbeck and his wife; four weeks annual vacation; reimbursement of travel and lodging expenses; and an eight-month severance package of eight months' salary and eight months' medical insurance in the event ICL terminated his employment.

Mr. Porbeck testified that he emailed the alternate proposals on February 12, 2007, to Ms. Ducote and Mr. John Carver.[2] When he did not hear from either individual, he sent a follow-up email requesting a speedy decision because he was scheduled to begin a new project for AFCO Steel in the near future. According to Mr. Porbeck, Ms. Ducote telephoned him to say that ICL wished to hire him pursuant to the terms of Option B. Mr. Porbeck requested the acceptance be reduced to writing, and, on February 22, 2007, he received an e-mail from Ms. Ducote which stated: "As outlined in option B of your proposal, Industrial Chemicals (US) Limited would like to go forward with your employment." According to Mr. Porbeck, he then received a February 26, 2007 email from Mr. Carver welcoming him to ICL, to which he responded the same day. In his response, Mr. Porbeck did not mention the terms of the contract in his email because he understood the agreement on the terms had already been reached.

For the next four years, Mr. Porbeck worked pursuant to the terms set forth in Option B. In fact, according to Mr. Porbeck, the Lecompte plant suffered a slowdown ahead of a new product launch in August of 2009, and, during the slowdown, Ms. Ducote called to inform him that she and Mr. Carver proposed to suspend his employment without pay until the new project began. In response, Mr. Porbeck emailed Mr. Carver, with a copy sent to Ms. Ducote, inquiring about the terms of the suspension and stating the following:

> If you recall, there was a provision agreed to in my employment proposal for an 8 month severance package where my wages and benefits would continue if my employment with ICGL were terminated. Would it be possible to start down that path and when the boehmite comes along, we could deduct the time spend between now and the start up from the 8 months of severance agreed upon?

---

[2] Mr. Carver and his brothers are the owners of the parent company owning ICL.

Mr. Porbeck testified that neither Mr. Carver nor Ms. Ducote responded to this email and the question of his suspension from employment never came up again.

According to Mr. Porbeck, the events leading to this litigation began in early March of 2001, when he received a telephone call from Chris Ryan, ICL's United Kingdom facility supervisor, informing him that his employment with ICL was terminated. Mr. Porbeck responded to this call by sending an email to Mr. Ryan on March 8, 2011, in which he stated:

> I wanted to make sure that you were aware of a couple of things that were agreed to in my employment contract with Industrial Chemicals. That is if I was terminated, that there would be a severance package covering 8 months after the termination that would allow me to find other employment. The severance package included both salary and benefits, which would include medical benefits. I wanted to bring this up before anyone might have inadvertently stopped the insurance benefit.
>
> I do appreciate Industrial Chemicals honoring the contract we agreed to 4 years ago when I was hired.

When he discussed the situation with Ms. Ducote, she suggested he contact Mr. Carver and provide him with an outline of the effects of his termination. He followed her suggestion and forwarded an email to Mr. Carver on March 14, 2011. Mr. Carver responded by reinstating Mr. Porbeck's employment and his salary and benefits remained uninterrupted until October 31, 2011. However, on that date, Ms. Ducote telephoned Mr. Porbeck to tell him that ICL no longer required his services.

The next day, November 1, 2011, Mr. Porbeck emailed Ms. Ducote concerning his October 2011 expense report, six additional months of outstanding expenses, and seven days of vacation owed him. Additionally, he addressed the severance issue in the email in the following manner:

The severance package includes 8 months of pay and 8 months of insurance coverage. My salary was $102k per year or $8,500 per month. 8 months would then be $68,000. If you want to do this as a lump sum payment, that would be fine with me. You can take out the taxes and the monthly insurance contributions. If we take October 31 as the termination date, then the insurance coverage should go through the end of June, 2012.

Mr. Porbeck received his vacation pay within a week of this email.

Seven days later, and following a conversation with Ms. Ducote, Mr. Porbeck emailed Mr. Carver and Ben Lowthian, ICL's UK accountant, stating:

Renea suggested I drop you an email to ask if you come to any decision on how the severance package would be handled? I was wanting to know for sure that my health insurance coverage will be continuing for the 8 months that is in our employment agreement and how the pay will be handled.

Mr. Carver responded to Mr. Porbeck by email that same day. He stated, "Rob, at the momentt [sic] as a result of your collective efforts there is no money to pay anybody."[3] Mr. Porbeck took Mr. Carver's response as an acknowledgement that ICL owed him the severance package. Numerous subsequent emails addressing the severance package were sent by Mr. Porbeck to Mr. Carver, Ms. Ducote, and Mr. Lowthian, but none brought him a response.[4] Mr. Porbeck did receive an expense check from ICL on April 11, 2012, but only after a demand letter from his attorney requesting payment of his outstanding expenses and the severance package was sent to ICL. According to Mr. Porbeck, no one from ICL told him why the severance package was not being honored, and he first learned that ICL disputed the very existence of the severance package after the negotiations shifted from the parties to the attorneys for the parties.

---

[3] Although objected to by ICL, the trial court allowed the email to be introduced, not for the truth of the matter, but to show that it was received by Mr. Porbeck.

[4] Emails were sent by Mr. Porbeck on November 28, 2011; December 6, 2011; December 13, 2011; December 26, 2011; January 4, 2012; and February 26, 2012.

Mr. Porbeck acknowledged at trial that he was an at-will employee and that the employment contract contained no fixed term. However, based on his February 12, 2017 proposal and Ms. Ducote's February 22, 2007 email acceptance, he felt he was owed the severance package regardless of how or why his employment with ICL was terminated. Furthermore, although he agreed that no one from ICL ever told him that he did have a severance package, he stated that no ever told him that he did not have a severance package. Mr. Porbeck disputes ICL's position with regard to the severance package based on the failure of Mr. Carver, Ms. Ducote, or Mr. Lowthian to ever dispute his right in either their conversations with him or in response to his numerous emails.

Ms. Ducote served as plant manager at the Lecompte facility since 2007. According to Ms. Ducote, the Lecompte facility is the only one operated by Industrial Chemicals Group Limited in the United States. Although Mr. Carver directly supervises her, Ms. Ducote has the authority to hire and fire employees, but testified that she did not have the authority to offer severance packages to potential employees. She acknowledged that she hired Mr. Porbeck for the salaried position of Processing Engineering Manager, but asserted that during the employment negotiations, she only communicated with Mr. Porbeck by telephone, and only discussed salary, benefits, travel, and vacation. Additionally, in the end, she only agreed to salary, health insurance benefits, and his work schedule. Ms. Ducote denied that she referenced "Option B" during their discussions or that she agreed to the severance package, which she said Mr. Porbeck never mentioned. Moreover, she denied ever discussing the proposed severance package with Mr. Carver. Although she did admit that Mr. Porbeck was hired under the exact terms

9

outlined in Option B, with the exception of the severance package, she stated that she never told him that ICL refused that proposed term.

Even though she claimed that all communication with Mr. Porbeck was by telephone, Ms. Ducote admitted receiving the emails Mr. Porbeck sent her as employment proposals, including the February 12, 2007 email setting forth Options A and B. Additionally, she had no recollection of Mr. Porbeck requesting that the acceptance of his proposal be reduced to writing, and she denied sending the February 22, 2007 email stating that, "[a]s outlined in option B of your proposal, Industrial Chemicals (US) Limited would like to go forward with your employment." Ms. Ducote explained that she never corresponds via emails when hiring employees. She stated that "it's face to face when we hire or on a phone call."

Ms. Ducote further admitted that even though she had the authority to hire and fire, she consulted with Mr. Carver before offering Mr. Porbeck employment because she lacked the authority to agree to his requested salary. According to Ms. Ducote, during his approximately four years of employment with ICL, Mr. Porbeck never requested that she reduce the severance-package agreement to writing and, that when she terminated his employment on October 31, 2011, he did not mention the severance package.

In explaining why ICL continued to pay Mr. Porbeck's health insurance for three months after October 31, 2011, Ms. Ducote stated there were two reasons: because it was pre-paid by ICL and because there was a delay initiating his

COBRA[5] insurance. This delay, she stated, was not uncommon and was not related to his employment contract or severance package.

According to Ms. Ducote, it was only after October 31, 2011, that she became aware that Mr. Porbeck was seeking severance payments. Although she learned this through his emails, she said that she never responded to his requests other than to tell him to bring the issue to the attention of Mr. Carver and Mr. Lowthian. She further admitted a conversation with Mr. Porbeck in which he asked her whether Mr. Carver would pay the severance package. However, rather than disabuse him of the idea, she testified that she told him to address his question to Mr. Carver. Although Ms. Ducote denied any further knowledge of Mr. Porbeck's claim, she acknowledged that she received or was copied on six other emails from Mr. Porbeck concerning the severance package. Ms. Ducote explained that she never responded because, as she stated, "there was nothing more for me to respond to 'cause I didn't have a severance agreement."

The record reflects that Ms. Ducote provided evidence on the severance issue through answers to interrogatories and her deposition as well as her testimony at trial, and often the answers were contradictory concerning her recollection of events and/or company policy. As an example, in her answer to an interrogatory and later at trial, she stated that Mr. Porbeck received four weeks of paid vacation per year. During her intervening deposition, she did not know the answer to that question. When asked at trial how she was able to answer the interrogatory, she initially suggested that she obtained that information from his

---

[5] COBRA stands for Consolidated Omnibus Budget Reconciliation Act, which was passed by the United States Congress in 1986, and provides for the temporary continuation of group health coverage. U.S. Dep't of Labor (Jan. 27, 2014), http://www.dol.gov/ebsa/faqs/faq-consumer-cobra.html

employment file. She then recanted by stating that she did not know what information the file contained or if it contained any information regarding his allotted vacation. Finally, she admitted that she obtained the information from Mr. Porbeck's February 12, 2007 email. Ms. Ducote also had to acknowledge at trial that Mr. Porbeck was the only employee who had four weeks of paid vacation, and that the employee manual provides an employee increasing weeks of vacation based on the length of employment. She suggested that all of the other employees would have one week of vacation for one year employment and that it would increase to a maximum of three weeks after five years. In fact, Ms. Ducote testified that she only receives three weeks of paid vacation per year.

The agreement concerning medical benefits for Mr. Porbeck and his wife were also an exception to company policy. According to Ms. Ducote, ICL normally did not provide health benefits to an employee until ninety days into his or her employment with ICL. However, in this case, because Mr. Porbeck requested medical benefits for him and his wife as part of Option B of his proposal, she admitted that ICL rushed his and his wife's coverage so that it would start commensurate with his employment.

In oral reasons, the trial court held that a lawful and enforceable employment contract existed between Mr. Porbeck and ICL, which included the severance package at issue. Although Mr. Porbeck was an "at-will" employee, the trial court held that the right to terminate such an employee could be altered by a specific contract or agreement. In ruling in Mr. Porbeck's favor, the trial court stated that it found Mr. Porbeck to be credible and that his testimony was corroborated by the fact that despite multiple references to the severance package, both pre- and post-

12

termination, ICL never repudiated it and, furthermore, it continued his health insurance for three months post termination.

After reviewing the record, we find no manifest error in the trial court's finding that an employment contract existed between Mr. Porbeck and ICL, which included the severance package at issue. At best, the explanation offered by Ms. Ducote for why she never responded to Mr. Porbeck's emails by repudiating the severance package is simply not believable. It is difficult to envision a business that when faced with the prospect of losing approximately $72,000.00, would fail to repudiate a charge or claim at the earliest instance possible.

Based on Mr. Porbeck's testimony, his February 12, 2007 email proposal, and Ms. Ducote's February 22, 2007 response, it is clear that the parties intended to enter into an employment contract that afforded Mr. Porbeck every term he requested in his proposal, including the severance package. Based on Ms. Ducote's testimony, it is further obvious that ICL did everything it could to secure the services of a highly qualified engineer. It allowed him to work a very unusual work schedule; agreed to the high salary he requested; allowed him a four-week paid annual vacation, one week more than even Ms. Ducote, herself, enjoyed; and accelerated his medical benefits by ninety days. Considering the extraordinary terms ICL agreed to, as well as its failure to repudiate Mr. Porbeck's pre- and post-termination claims of a severance package and its three-month continuation of his medical benefits, it is clear that the severance package was agreed to by the parties.

Furthermore, based on the fact that Mr. Porbeck was resigning his employment with his then current employer, it is not surprising that he would request Ms. Ducote to put ICL's acceptance of his proposal in writing. And, although Ms. Ducote claims that she only conducted employment negotiations

13

either on the telephone or face to face, Mr. Porbeck, in this case, was already a known entity as he was ending a four-month consulting contract with ICL when he was hired. Thus, Mr. Porbeck was not, technically, a new hire who required face to face negotiations with Ms. Ducote. It is not inconceivable, under these facts, that she conducted negotiations with Mr. Porbeck, in part, via email.

We further find no merit in ICL's argument that Mr. Porbeck's status as an "at-will" employee rendered the employment contract between the parties invalid. ICL bases its argument on La.Civ.Code arts. 2747 and 2748. It further argues that because Mr. Porbeck admitted that he was an "at-will" employee, he was free to quit and ICL was free to terminate his employment at any time, provided the termination did not violate any statutory or constitutional provision. In making this argument ICL relies on *Newsom*, 107 So.3d 781, for support. However, we do not find that the holding in *Newsom* supports ICL's position.

In *Newsom*, we initially stated that the employer and employee could enter into any terms of employment so long as they were not prohibited by law or public policy. We further stated that absent such a contract, the default terms of employment existing between the parties would be provided by La.Civ.Code arts. 2747 and 2748. Pursuant to those provisions, we determined that the only time post-termination liability was enforceable was in a situation in which the employee was hired pursuant to a fixed term of employment. In situations involving an "at-will" employee, we held, as quoted by ICL, that "the at-will employment concept is a two-edge sword which protects both the employer and employee, with equal force, from liability at separation." *Id.* at 786.

Since, under the facts at issue, Mr. Porbeck and ICL entered into a specific contract of employment, the default conditions provided by La.Civ.Code arts. 2474

14

and 2478 do not apply. Rather, the parties are bound by the terms of their agreement, which the trial court held, and we affirm, provides Mr. Porbeck with a severance package.

Based on the foregoing, we affirm the trial court judgment finding that a valid and enforceable employment contract existed between Mr. Porbeck and ICL and that the contract provided a severance package.

*Penalties and Attorney Fees*

In its third assignment of error, ICL argues that the trial court erred in holding that the severance package qualified as wages pursuant to La.R.S. 23:631 and 23:632 and in awarding Mr. Porbeck statutory penalties and wages pursuant to these provisions. We find merit in this assignment of error.

Louisiana Revised Statutes 23:631 provides, in part:

A. (1)(a) Upon the discharge of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday or no later than fifteen days following the date of discharge, whichever occurs first.

(b) Upon the resignation of any laborer or other employee of any kind whatever, it shall be the duty of the person employing such laborer or other employee to pay the amount then due under the terms of employment, whether the employment is by the hour, day, week, or month, on or before the next regular payday for the pay cycle during which the employee was working at the time of separation or no later than fifteen days following the date of resignation, whichever occurs first.

(2) Payment shall be made at the place and in the manner which has been customary during the employment, except that payment may be made via United States mail to the laborer or other employee, provided postage has been prepaid and the envelope properly addressed with the employee's or laborer's current address as shown in the employer's records. In the event payment is made by mail the employer shall be deemed to have made such payment when it is mailed. The timeliness of the mailing may be shown by an official

15

United States postmark or other official documentation from the United States Postal Service.

(3) The provisions of this Subsection shall not apply when there is a collective bargaining agreement between the employer and the laborer or other employee which provides otherwise.

Louisiana Revised Statutes 23:632 provides:

Any employer who fails or refuses to comply with the provisions of R.S. 23:631 shall be liable to the employee either for ninety days wages at the employee's daily rate of pay, or else for full wages from the time the employee's demand for payment is made until the employer shall pay or tender the amount of unpaid wages due to such employee, whichever is the lesser amount of penalty wages. Reasonable attorney fees shall be allowed the laborer or employee by the court which shall be taxed as costs to be paid by the employer, in the event a well-founded suit for any unpaid wages whatsoever be filed by the laborer or employee after three days shall have elapsed from time of making the first demand following discharge or resignation.

In *Boudreaux v. Hamilton Medical Group, Inc.*, 94-879, pp. 4-5 (La. 10/17/94), 644 So.2d 619, 621-22 (alteration in original), the supreme court stated with regard to these two statutes:

These statutes, being penal in nature, must be strictly construed and their provisions yield to equitable defenses. *Mitchell v. First National Life Insurance Co. of La.*, 236 La. 696, 109 So.2d 61, 63 (1959); *Clevy v. O'Meara*, 236 La. 640, 108 So.2d 538, 539 (1959). The statutes refer to "wages" and subject the employer to the payment of penalties and attorney fees if the wages are not paid timely. In *Mason v. Norton*, 360 So.2d 178, 180 (La.1978), we stated that these statutes are designed to compel prompt payment of *wages* upon an employee's discharge or resignation. The term "wages" is defined as money that is paid or received for work or services, as by the hour, day or week. Webster's New Universal Unabridged Dictionary 1604 (1992). In La.R.S. 23:631, the "amount due under the terms of employment" is modified by the phrase "whether the employment is by the hour, day, week, or month, . . ." We have held that this phrase in La.R.S. 23:631 "whether the employment is by the hour, day, week, or month" refers to the pay period for the compensation. *Mason v. Norton*, 360 So.2d at 180. In *Stell v. Caylor*, 223 So.2d 423, 426 (La.App. 3d Cir.), *writ refused*, 254 La. 778, 226 So.2d 770 (1969), the court stated:

[T]he inclusion in the statute of the words "whether the employment is by the day, week or month" seems clearly to signify that only amounts due as wages are contemplated. Otherwise these words would be superfluous. If the statute is intended to cover all amounts due by the employer to the employee, regardless of whether they are wages, there is no need for the statute to specify the pay periods of wages.

Since the phrase in La.R.S. 23:631 "any amount then due under the terms of employment" is modified by the phrase "whether the employment is by the hour, day, week, or month" (pay period), it is obvious that "the amount then due under the terms of employment" set forth in La.R.S. 23:631 refers to wages which are earned during a pay period. In other words, "terms of employment" refers to a particular pay period. Therefore, only compensation that is earned during a pay period will be considered wages under the statutes. This interpretation is consistent with the references to "wages" throughout the statutes.

Having determined that "wages[,]" as intended by La.R.S. 23:631 and 632, meant only those wages earned during a pay period, the supreme court held that the compensation provided by the contract at issue, which was to be paid to the plaintiff only upon termination, did not constitute wages and that the plaintiff was not entitled to the statutory penalties and attorney fees provided by La.R.S. 23:632.

The severance package at issue here is basically identical in nature to the compensation on termination at issue in *Boudreaux*. As stated in *Clavier v. Lay Down Serv., Inc.*, 00-701, p. 5 (La.App. 3 Cir. 12/20/00), 776 So.2d 634, 638, *writ denied*, 01-880 (La. 5/25/01), 793 So.2d 203, "[a]s a court of appeal, we are bound to follow the decisions of our supreme court." Our research reveals that *Boudreaux* has not been overturned and that neither La.R.S. 23:631 and 632 have been legislatively amended since that decision; thus, we are bound to apply the supreme court's interpretation of those provisions. Thus, Mr. Porbeck is not entitled to statutory penalties and attorney fees based on ICL's failure to comply with the employment contract. Accordingly, the trial court judgment awarding Mr.

17

Porbeck statutory penalties and attorney fees is reversed and judgment is rendered in favor of ICL on this issue.

Based on this finding, we need not address ICL's fourth assignment of error.

*Evidentiary Issue*

In its final assignment of error, ICL argues that the trial court erred in admitting Ms. Ducote's February 22, 2007 email into evidence over its objection that the email was insufficiently authenticated. We find no merit in this argument.

The email in question states:

As outlined in option B of your proposal, Industrial Chemicals (US) Limited would like to go forward with your employment.

I look forward to working with you.

Regards,
Renea Ducote
Plant Manager

Ms. Ducote denies sending this email, and her denial is three-fold: (1) she could not find the email on her computer; (2) the writing style is too formal; and (3) this is not how she signs off on her emails. She explained that she does not write this formally in her emails and that, normally, she signs off: "Regards, Renea[.]" She said that when addressing someone from another company, she signs her emails:

Regards,
Renea Ducote
Plant Manager
Industrial Chemicals (US) Limited
(cell number)

She further testified that she never communicates with potential new employees by email. Rather, she said that she either calls them by telephone or, when actually hiring them, meets with them face to face. However, when shown a January 14, 2009 email from her to Mr. Porbeck, with the exact salutation as the February 22,

18

2007 email, Ms. Ducote, although she admitted that it contained her name, did not recall sending the email. On other emails, she admitted that she signed off in various other manners: 1) Renea Ducote, Plant Manager Industrial Chemicals (US) Limited, (cell phone); 2) no salutation; 3) FYI-Renea; 4) Thanks, Renea; 5) Renea; 6) Regards, Renea Ducote; and 7) Regards, Renea.

Mr. Porbeck testified that he provided ICL with all emails pertaining to the severance package which originated from his ICL work computer. He stated that the email in question was not included in those emails because it occurred prior to his employment with ICL and was on his home computer. He further explained that his home computer crashed in approximately 2008, and none of the emails located on that computer were retrievable. He explained that the email in question was a contemporaneous copy he made and filed at home.

Based on testimony and evidence, we find no abuse of discretion on the part of the trial court in admitting the February 22, 2007 email. "The trial court is given vast discretion in its evidentiary rulings, and its decision to admit or exclude evidence will not be reversed on appeal in the absence of an abuse of discretion." *In re Succ. of Jones*, 08-1088, p. 3 (La.App. 3 Cir. 3/4/09), 6 So.3d 331, 335. The numerous emails introduced into evidence by Mr. Porbeck disproves Ms. Ducote's claim that she consistently signs her emails in the manner she indicated. In fact, her January 14, 2009 email contains the exact salutation as the February 22, 2007 email. We further find no merit to her argument that the style of the email is too formal. Accordingly, this assignment of error is dismissed as being without merit.

## DISPOSITION

For the foregoing reasons, we reverse the judgment of the trial court awarding Robert Porbeck penalties and attorney fees and render judgment in favor

of Industrial Chemicals (US) Limited on this issue. We affirm the judgment of the trial court in all other respects. We assess costs of this appeal equally between Robert Porbeck and Industrial Chemicals (US) Limited.

**AFFIRMED IN PART; REVERSED IN PART; AND RENDERED.**